# Appeal of Elliott's Executors.

## Clay's Appeal.

*Life insurance.—Policy taken out by insolvent debtor and assigned to wife, fraudulent as to creditors.*

1. The assignment of policies of life insurance by a debtor who was insolvent when insured, in trust for the benefit of his wife, is fraudulent and void as against creditors.

2. But policies of insurance effected without fraud directly and on their face for the benefit of the wife, and payable to her, are not to be held fraudulent as to creditors.

APPEAL from the Orphans' Court of *Philadelphia.*

This was an appeal by Eliza T. Elliott and J. Thomas Elliott, executors of the last will and testament of Isaac Elliott, deceased,

50   75
194  422
50   75
198  100

[Appeal of Elliott's Executors.]

from the decree of the Orphans' Court of Philadelphia county confirming the auditor's report In re Isaac Elliott's estate, and dismissing their exceptions thereto.

The appellants filed their account, which was referred to an auditor by the court below. There were two questions discussed before that officer, and decided in his report: 1st. As to the commissions of the executors, in which he reduced their claim by $569.63; 2d. As to surcharging the accountants with the amounts of three policies effected by Isaac Elliott upon his life; on which point he surcharged them with one policy, and declined surcharging them with the other two.

The executors assigned as error this reduction of their commissions, and the surcharging of $10,000 for the one life policy.

The case was this:—Isaac Elliott, a conveyancer in Philadelphia, died in November 1859, when it was discovered that his estate was insolvent. Prior to his death he had effected four policies of insurance upon his life, each in $10,000. The companies who issued the policies were the International, the Manhattan, the New England, and the Mutual.

The three first-mentioned policies were assigned by Mr. Elliott to a trustee for his wife, the last was not; the executors collected the amount of this policy, and carried it into their account. The auditor having, at the request of the creditors of deceased, surcharged the accountants with amount of one policy, and declined surcharging them with the other two, the executors complained of the first branch of his decision, and the creditors of the second.

The facts connected with the assignments are as follows:—

On 12th February 1859, Isaac Elliott effected the insurance with the International Company. The terms of this policy expressly provide that the insured "may assign to whomsoever he pleases, without the knowledge or assent of the society." On 10th September 1859, Mr. Elliott endorsed upon this policy an assignment of all right, title, and interest therein, to J. Thomas Elliott, "in trust for the only use and benefit of my wife, Eliza T. Elliott, her heirs and assigns."

On 2d March 1859, he effected the insurance with the Manhattan Company; and on 10th September 1859 he made a similar endorsement on this policy.

On the 3d March 1859, he effected an insurance with the New England Company, and on the 10th September 1859 he also endorsed a similar assignment on this policy. The two last-mentioned companies had not waived notice of assignment (as had been done by the International), and Mr. Elliott gave them written notice of his assignments. The policy of the New England Company stipulated that an assignment should be void, unless assented to in writing by the company, and this assent was duly given.

These three policies were assigned on the same day to a trustee

[Appeal of Elliott's Executors.]

for his wife, and remained together in his fire-proof, where they were found after his death. The moneys were collected upon all three policies, by the trustee named in the assignments, and invested in the individual name of the *cestui que trust*.

The auditor ruled that the transfer of the International policy was invalid, because no notice had been given to the company, and because the policy was found among Elliott's papers after his decease.

Another ground of exception was, as to the commissions of the executors. They debited themselves with the amount of cash received by them, and with the proceeds of real estate sold under order of the Orphans' Court, for payment of debts. The commission (three per cent.) was charged upon the gross sales of the real estate, some of which were deducted by the purchaser, who was a mortgage-holder, and some of which were paid into court. The auditor allowed only one per cent. upon the amount of the mortgage-debt allowed against the purchase-money. The executors complained of this reduction.

A number of exceptions were filed to the auditor's report, all of which were overruled by him.

The court below confirmed the report for the reasons assigned by the auditor, and dismissed the exceptions. This appeal was then taken by the accountants, who averred that the learned court below erred

1. In affirming the report of the auditor so far as concerns the reduction of the executors' commissions.

2. In not reversing that portion of the report which disallows $596.63 of the executors' commissions.

3. In affirming said report so far as concerns the surcharge of the executors with the amount of the policy of the International Life Assurance Company, viz. $9676.

4. In not reversing that portion of the report which surcharges the accountants with the amount paid by the International Life Assurance Company ($9676) on their policy upon Isaac Elliott's life.

5. In not reversing that portion of the report which surcharges them with interest on the amount received by the widow under a claim of right, $1719.

An appeal was also entered by Joseph A. Clay, Esq., administrator of Elizabeth Ruth, who complained that the court below erred—

1. In confirming the report of the auditor refusing to surcharge the executors with the sums received from the Manhattan Life Insurance Company of New York, and the New England Mutual Life Insurance Company, upon their respective policies of insurance on the life of the testator, with interest from the times of the receipt.

2. In not overruling the report of the auditor affirming the validity of the assignments of the said policies of life insurances, and in not ruling that such assignments were fraudulent and void as to creditors of the testator.

3. In not ruling that the attempted gifts of the said policies of life insurance were inchoate .and incomplete, and therefore void as to creditors of the testator.

4. In confirming the report of the auditor allowing a commission of three per cent. to the executors, on receipts from sales of real estate, and a commission of one per cent. on the amount of the mortgage.

*C. Guillou*, for the accountants.—On the question of commissions he cited John Miller's Estate, 1 Ashmead 323 ; Pusey *v.* Clemson, 9 S. & R. 204 ; Walker's Estate, Id. 223 ; Stevenson's Estate, 4 Whart. 98 ; Nathan *v.* Morris, 4 Id. 390 ; Shunk's Appeal, 2 Barr ; Robb's Appeal, 5 Wright 49.

As to the transfer of the policies of insurance, he argued—

1. That it is the policy of the law to encourage the effecting of insurance on a father's life in favour of his widow and orphans, thereby providing for their maintenance and so distributing the burden of their support that it may bear insensibly among many stockholders.

2. That a husband who is unable to pay his debts is not bound by the laws to forego such insurance, thereby leaving his family to become paupers and chargeable to the community.

3. That he may effect an insurance on his life for the benefit of those whom the law holds him bound to support so long as he lives, thus permitting him to "furnish a substitute," which may to some extent discharge a duty that the law required him to perform so long as earthly laws could reach him.

4. That in effecting such insurance, his designation of a trustee for his widow and children will be respected, if not in preference to, at least as favourably as a direct appointment in favour of his wife without such intervention ; and this, too, whether the latter be made by a written order or assignment, endorsed upon the policy, or incorporated into the body of the instrument on his request, made at the time of effecting insurance ; and

5. That the Christian spirit embodied into our law which prevents creditors from attaching the wages of a debtor, will also prevent their seizing the only possible substitute for his life in performing the duty of keeping the family from becoming a public burden ; citing and relying, as to the assignment, on Nesmith *v.* Drum, 8 W. & S. 10 ; Ashmead *v.* Borie, 10 Barr 154 ; Vandyke *v.* Christ, 7 W. & S. 374 ; Sims *v.* Thomas, 12 Ad. & E. 536 ; Dalby *v.* Life Ins. Co., 28 E. C. L. R. ; Law *v.* London Life Ins. Co., 1 Kay & Johnson 228 ; Trenton Mutual *v.* Johnson, 4 Za-

[Appeal of Elliott's Executors.]

briskie 576; Holdship *v.* Patterson, 7 Watts 547; Ashurst *v.* Given, 5 W. & S. 330; Fisher *v.* Taylor, 2 Rawle 33; Vaux *v.* Parker, 7 W. & S. 25; and as to delivery, Chess *v.* Chess, 1 Penna. Rep. 35; Hannah *v.* Warner, 8 Watts 11; Money *v.* Tobias, 12 Johns. 421; Verplank *v.* Sterry, Id. 536; Blight *v.* Shenck, 10 Barr 289; Arrison *v.* Harmstead, 2 Id. 193.

That no delivery was necessary, this being in the nature of a declaration of trust: Duffy *v.* Ins. Co., 8 W. & S.; Stickney *v.* Borman, 2 Barr 68; Coates *v.* Gerlach, 8 Wright 43; Carpenter *v.* Moyer, 5 Watts 485; Northey *v.* Northey, 2 Atk. 77; and that the transfer could not be impeached by executors: Twelves *v.* Twelves, 3 Whart. 485; Vandyke *v.* Christ, 7 W. & S. 373; Weber *v.* Samuel, 7 Barr 489.

*R. C. McMurtrie* and *E. Spencer Miller,* for Mrs. Whitman, a creditor of deceased, with whom was *Joseph A. Clay,* for the estate of Mrs. Ruth, contended: 1. That the transfer was a fraud upon creditors. It was a gift by a man wholly insolvent. Here is a man who has taken a sum of money which he possessed, and has bought with it a policy on his life. This is a piece of property. Suppose it were a policy of insurance against fire. Suppose Mr. Elliott, as a creditor, had insured the life of a debtor, and assigned this to his wife. There is nothing in the nature of the property which enables an insolvent debtor to give it away. It may be argued, that this is a species of property that a creditor could not touch. What foundation is there for such an allegation? A life policy passes to assignees in bankruptcy (Schendess *v.* Wall, 1 Camp. 487), and their title will cut out a subsequent assignment. And notice to insurers is necessary to prevent such a title from vesting in assignees: Williams *v.* Thrope, Sim. Ch. Rep. 257; West *v.* Reid, 2 Hare 249; Ex parte Price, 13 L. J. Rep. Bank. N. S. 15; In re Styan, 1 Philips' Ch. 105. What is to forbid a creditor from laying an attachment in the hands of the insurer, and obtaining the avails of it when the debtor dies? But if there were technical difficulties in the way of an attachment, equity would interfere in the creditor's favour, as in case of a legacy, prior to our act allowing it to be attached.

2. There was no delivery of the instrument transferring the policy in the International. There is no evidence that the fact of such transfer was communicated to any one. It was in proof that the trustee did not know of the transfer. There is no pretence that value was paid—but the transaction was purely voluntary. Under these circumstances, the authorities all maintain this ruling. The distinction is between a declaration of trust and a. gift, or transfer: Ex parte Pye, 18 Ves. 149. A gift, if complete, passes the property. If the subject be a chattel, delivery is

essential; without it, all declarations are 'but evidence of an intent unexecuted. If it be stock or a chose in action, and is assignable at law, there must be a complete transfer, so as to pass the title. If not assignable at law,;there must be such a perfected transfer as would pass the right at law if assignable. Where the transfer is by way of assignment—there being no binding contract—there must be delivery of the evidences, or of the instrument of transfer. Want of delivery of an instrument purporting to be an assignment, is as fatal in equity as at law. Retention of the instrument, if once complete by delivery, is immaterial; but the *factum* of delivery is as essential to its existence as an assignment as to a deed. Nor can an incomplete assignment operate as a declaration of trust. It is only where assignments cannot operate at law that equity enforces them upon the maxim *ut res magis valeat*, as a declaration of trust, because the equitable or beneficial right had thereby passed: Mark *v.* Kettlewell, 1 Phil. 347. Neither can it operate as a declaration of trust, because it is not binding as a contract at law or in equity. See Earle *v.* Law, 15 Sim. 95; Antrobus *v.* Smith, 12 Ves. 39. Nor can it operate as a declaration of a trust any more than would any other instrument intended to evidence a gift, but incapable of passing the property. See Fletcher *v.* Fletcher, 4 Hare 80; Uniacko *v.* Giles, 2 Molloy 257; Edwards *v.* Jones, 1 M. & Cr. 226; Fortescue *v.* Barnet, 3 M. & K. 36. Had the executor of Mr. Elliott been a stranger and taken possession of the policy, Mrs. Elliott and her trustee must have asked the aid of the court, when she would have been met by the want of delivery, and hence the imperfectness of her title.

3. Commissions.—It is submitted that the allowance was ample —the estate sold was but an equity of redemption—on the proceeds of that she received three per cent.;—upon what really formed no part of the estate she was allowed one.

The opinion of the court was delivered, June 29th 1865, by

READ, J.—Policies of assurance against fire and against marine risks, are both properly contracts of indemnity, the insurer engaging to make good, within certain limited amounts, the losses sustained by the insured in buildings, ships, and effects. But " the contract commonly called life assurance, when properly considered, is a mere contract to pay a certain sum of money on the death of a person, in consideration of the due payment of a certain annuity for his life; the amount of the annuity being calculated in the first instance, according to the probable duration of the life; and when once fixed it is constant and invariable. The stipulated amount of annuity is to be uniformly paid, on one side, and the sum to be paid in the event of death is always (except where bonuses have been given by prosperous offices) the same on the

other. This species of insurance in no way resembles a contract of indemnity." This is the measured language of Baron Parke, now Lord Wensleydale, a very learned judge, in delivering the unanimous opinion of the Court of Exchequer Chamber, in Dalby *v.* The India and London Life Assurance Company, on the 2d December 1854, reversing and overruling the decision in Godsall *v.* Boldero, 15 Com. Bench 365 (80 E. C. L. R). In this case, which is now the settled law of England, it was held that independent of the Act of 14 Geo. 3, c. 48, as to assurances of lives, all contracts for wager policies, and wagers which were not contrary to the policy of the law, were legal contracts at common law ; and that under that statute, if there was an interest at the inception of the policy, it was not necessary that it should exist when it became payable.

Life assurance, as by a Gallicism it is called in England, commenced there upwards of a century and a half ago, and in 1859 there were one hundred and fifty-nine companies, comprising proprietary companies based upon a paid-up or promised capital, for which interest is paid upon shares ; mutual societies founded upon the asserted sufficiency of the premium fund, and mixed companies proceeding upon a combination of both principles. As a broad principle large companies can afford to be generous, and the Equitable boasts that it has never "but in two instances disputed a claim out of its numerous and vast engagements," and that is remarkable for a society that has paid away in all forms twenty-nine millions sterling, or one hundred and forty-five millions of dollars. Policies in good offices after five or seven years' standing are always saleable, and a considerable number are sold by auction every year. "We noticed," says the Edinburgh Review, of January 1859, "the advertisement of sale of a sale in Dublin of twenty-seven policies of assurance in various offices. It is worthy of remark that they generally find purchasers at fair values when effected in the first class offices. The offices themselves will state the value of their own policies for a fee ; and the common practice is to obtain the office value, and that of an independent actuary, before the sale."

The business of life insurance, as we call it, has been largely· extended within the last few years in the United States, by companies both foreign and domestic. In the case before us the decedent effected four policies on his life, in four distinct companies, each in $10,000. One of these was not assigned, and its proceeds have passed into the accounts of the executors ; all the other policies, three in number, which were effected on the 12th February and 2d and 3d March 1859, were on the 10th September in the same year, by assignments on the respective policies, assigned to "J. Thomas Elliott in trust for the only use and benefit of my wife Eliza T. Elliott, her heirs and assigns," and to two of the compa-

14 WR.—6

nies notice of the assignments was given in due form by Mr. Elliott, the decedent, agreeably to their rules, but no notice was given to the International Life Assurance Society of London, that company not requiring such notice of the assignment; the three documents remained together in his fire-proof, and were there found after his death in November 1859. The auditor charged the executors with the International policy, but refused to surcharge them with the other two policies, which report was confirmed by the Orphans' Court, from which the executors have appealed as to the surcharge of the one policy, and Mr. Clay has appealed from the other part, declining to surcharge them with the other two policies. I am inclined to think under the decision of the Lords Justices, reversing the Master of the Rolls, In re Ways' Trusts, 34 L. J. C. 49, 10 Jurist N. S. 1166, that all these assignments stand on the same footing, notice of the assignment to the trustee or to the company in the case of the International being unnecessary. These assignments were all voluntary, and would have been good against heirs, devisees, or legatees, but here the decedent died insolvent, and the question is, are they good against creditors. These policies were securities for money, valuable choses in action which could be sold at public and private sale, and are included in the general words personal estate or property, and would pass under that head by deed or will. The words used in the statute of 13 Eliz. c. 5, are goods and chattels, which is the generic denomination of things personal as distinguished from things real, or lands, tenements, and hereditaments, and therefore includes life insurance policies, although unknown at the time of the passage of the statute, and it is clear that the voluntary assignments in the present case did disturb, hinder, delay, and defraud the creditors of the decedent. In England, in the later cases, it has been held that unless the property conveyed can be reached by execution, the conveyance is not fraudulent, because it does not delay or hinder creditors; a very narrow and inequitable rule, and contrary to the earlier cases as held by Chancellor Kent, (1 Story's Com. 368).

By an Act of 1 & 2 Vict. c. 110, passed 16th August 1838 (14 Stat. at Large 950–1), under a *fi. fa.* the sheriff may seize money or bank notes, checks, bills of exchange, promissory notes, bonds, specialties, or other securities for money; and in Stokoe *v.* Cowan, 7 Jur. N. S. 901, life policies are regarded as securities for money, and a voluntary conveyance of them was held fraudulent as against creditors under stat. 13 Eliz. c. 5. But in Norcutt *v.* Dodd, 1 Craig & Phillips 100, it was held in a case unaffected by the statute of 1 & 2 Vict. c. 110, that a voluntary alienation of the property by a party who, at the time of such alienation, was insolvent, may be set aside in a suit by his assignees subsequently appointed under the Insolvent Debtors' Act, although the subject

of such alienation be a chose in action. Lord Chancellor Cottenham said: " This being an assignment of a chose in action, and the debtor being still living, the transaction is not fraudulent under the statute of Elizabeth alone," but under that contract taken in connection with the Insolvent Debtors' Act, I am of opinion that it is. The difficulty which arose upon the statute of Elizabeth with respect to voluntary assignments of choses in action was, that during the lifetime of the debtor, creditors could not be said to be prejudiced by them, inasmuch as that species of property was not subject to be taken in execution; but after his death it was otherwise, because then the creditors might reach all his personal property, of whatever kind; and the same reason applies when the debtor has brought himself within the operation of the Insolvent Debtors' Acts, because under those acts all his property becomes applicable to the payment of his debts." This is also the case in bankruptcy, so that assignees in bankruptcy and in insolvency, and executors or administrators of an insolvent, may as representing creditors set aside any fraudulent conveyance, of any property of the bankrupt or insolvent, whether it be liable to execution in his lifetime or not. In Pennsylvania, under the mixed jurisdiction of our courts, it is settled that the executor or administrator of an insolvent estate may set aside a fraudulent conveyance, as he is in such a case a trustee for creditors.

Mr. Justice Rogers, in Penrod v. Morrison, 2 Penna. Rep. 130, said, " Although Mitchell could not collect his debt by *fi. fa.*, and levy, as a chose in action, is not the subject of execution, yet satisfaction might have been attained by compelling Morrison to assign for the benefit of his creditors."

These three assignments of the three policies which are the subjects of the appeals before us, were therefore all fraudulent as against the creditors of the decedent, and his executors must be surcharged with the other two in addition to the one with which they were surcharged in the court below.

The testator was hopelessly insolvent in 1859, and for some time previous. The insurances were effected in February and March of that year, assigned on the 10th September following, he dying two months afterwards, when the policies became due and payable. The assignments do not appear to have been known to the trustee or *cestui que trusts*, certainly not to his creditors, who were apparently first aware of his situation by the developments succeeding his decease. We can therefore have no difficulty in holding these assignments fraudulent and void, and that the proceeds of the policies belong to the creditors and estate of the decedent.

We are to be understood in thus deciding this case that we do not mean to extend it to policies effected without fraud directly and on their face for the benefit of the wife, and payable to her;

such policies are not fraudulent as to creditors, and are not touched by this decision.

The effect is to reverse so much of the decree of the court below as does not charge the *accountants with the two other policies, and leaves undisturbed the only one already charged to them, and the part of the decree as to commissions and other charges. This dismisses the appeal of the executors, and Clay's Appeal is successful so far as relates to the proceeds of the two policies and no further.

> This cause came on to be heard and was argued by counsel, and thereupon, upon consideration thereof, it is ordered, adjudged, and decreed as follows: That the decree of the Orphans' Court confirming the report of the auditor be reversed, so far as it refuses to charge the executors of Isaac Elliott, deceased, with the sums received from the Manhattan Life Insurance Company of New York, and the New England Mutual Life Insurance Company, upon their respective policies of insurance upon the life of the said Isaac Elliott. And that the executors be surcharged with the said sums with interest from the date of receipt. And, further, that the remainder of the said decree of the Orphans' Court be affirmed; and the cause is remitted to the said Orphans' Court to carry this decree into effect. The costs of the appeal in the said Orphans' Court and in this court to be paid out of the fund for distribution.

In Clay's Appeal the decree was,

> This cause came on to be heard and was argued by counsel, and thereupon, upon consideration thereof, it is ordered, adjudged, and decreed as follows: That the decree of the Orphans' Court, confirming the report of the auditor, be reversed, so far as it refuses to charge the executors of Isaac Elliott, deceased, with the sums received from the Manhattan Life Insurance Company of New York, and the New England Mutual Life Insurance Company, and that the executors be surcharged with the said sums with interest from the date of the receipt. And, further, that the remainder of the said decree of the Orphans' Court be affirmed, and the cause is remitted to the said Orphans' Court to carry this decree into effect. The costs of this appeal in the said Orphans' Court and in this court to be paid out of the fund for distribution.