FLORENCE PEARLMAN, TRANSFEREE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 112500. Promulgated September 27, 1944.

*Nathan Silberstein, Esq.,* and *M. Wolf, Esq.,* for the petitioner.
*Myron S. Winer, Esq.,* for the respondent.

36

38

OPINION.

MELLOTT, *Judge*: As indicated at the outset, the issue is whether petitioner, under the facts, is liable in equity for the income taxes of her deceased husband. The applicable statute is shown in the margin.[4]

Although many cases have been decided under the transferee provisions of the statute, this is the first in which the precise question now before us has arisen. Beneficiaries under life insurance policies, however, have been held liable for the estate tax where the tax sought to be collected arose because of the inclusion in gross estate of the proceeds of insurance in excess of $40,000, *Edna F. Hays et al., Executors*, 34 B. T. A. 808; the widow of a deceased has been held liable, as a transferee, for the income tax of her husband where the proceeds of insurance policies on his life, payable to his estate, had been set aside to her by the probate court under a state statute, *May R. Kieferdorf*, 1 T. C. 772; affd., *Kieferdorf* v. *Commissioner*, 142 Fed. (2d) 723; and the Court of Appeals for the District of Columbia has reversed our holding (*John Hancock Mutual Life Insurance Co.*, 42 B. T. A. 809) that insurance companies with which the proceeds had been left pursuant to the terms of the policies and of settlement agreements were transferees under section 316 of the Revenue Act of 1926, pointing out that Congress had obviously intended "that the beneficiary alone was to be liable in the case of the insurance estate." *John Hancock Mutual Life Ins. Co.* v. *Helvering*, 128 Fed. (2d) 745.

The cited cases, while not determinative of the present issue, lend a modicum of support to respondent's contention, expressed upon brief in the following language:

Pearlman intended to make a most unreasonable provision for his wife and to wholly disregard the claims of his creditors. He was fully apprised of his inability to pay his debts which were in excess of $1,000,000 when he undertook to secure to her by the expenditure of his own means, an estate in the form of insurance on his life in an amount in excess of $300,000. In so doing, he converted to her benefit, in the payment of premiums, large sums of money in each year which in good conscience should have been paid to his creditors. The circumstances connected with the transactions that occurred during his insolvency * * * leave no doubt but that he had determined to provide for his wife and children in total disregard of the rights and claims of creditors.

---

[4] SEC. 311 [Internal Revenue Code]. TRANSFERRED ASSETS.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this chapter (including the provisions in case of delinquency in payment after notice and demand, the provisions authorizing distraint and proceedings in court for collection, and the provisions prohibiting claims and suits for refunds) :

(1) TRANSFEREES.—The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this chapter.

\* \* \* \* \* \* \*

(f) DEFINITION OF "TRANSFEREE."—As used in this section, the term "transferee" in cludes heir, legatee, devisee, and distributee.

The premiums which secured the policies and kept them alive were part of his estate and were diverted from the payment of his debts to investments for his wife and children. He was hopelessly insolvent [when the beneficiaries were changed], his insolvency continued at all times subsequent * * * [and] the transfers were without consideration and void and fraudulent as against his creditors, including the United States Government. * * * At the death of Pearlman, petitioner, as donee beneficiary, acquired valuable property rights or choses in action against * * * [the insurance companies]. [She therefore became] the trustee of a constructive trust for the benefit of his creditors, was bound in equity to exercise the rights conferred upon her as primary beneficiary, * * * [and is therefore] liable for the full amount of his unpaid tax liability.

Both parties recognize that the transferee provisions create no new liability, but merely provide a new remedy for enforcing an existing liability at law or in equity. *Phillips* v. *Commissioner*, 283 U. S. 589; *Hulburd* v. *Commissioner*, 296 U. S. 300. Also that the liability is to be tested primarily by the law of the state of the domicile, in this instance Pennsylvania.

The first charge made by the respondent, in our judgment, is without substance. "* * * the law does not prevent an insolvent from carrying insurance for the benefit of his wife, children, or other dependent relatives." *Irving Bank* v. *Alexander*, 280 Pa. 466; 124 Atl. 634, 635. We pass, then, to consideration of the argument of the parties directed to what seems to be respondent's major contention, that the assignments of the policies—i. e., the changes of beneficiaries to petitioner or to the insurance companies for her benefit—were in fraud of creditors, including the Government. Before doing so, however, it should be stated that this contention is wholly without foundation as to the two Prudential policies [5] and it is at least doubtful whether it is sound as to the three New York Life policies, taken out by Pearlman in 1907 and 1916.[6] In the last mentioned, petitioner, or the insurance company as a trustee for her, was at all times the named beneficiary except for a two-day period in 1932 and two brief periods in 1933. Cf. *Newman* v. *Newman*, 328 Pa. 552 (1938); 198 Atl. 30. In the Prudential policies, however, she was at all times either the named beneficiary or the one to whom payments were to be made during her life.

Briefly restating the facts with reference to the other five policies, four of them [7] stemmed from a $100,000 policy which had been issued

---

[5] Lines 4 and 9.

[6] Lines 1, 2, and 3. Respondent, applying the appropriate factor (9.73131) shown in table A, article 19 of Regulations 79 (1936 Edition) relating to the valuation of property, calculated the value of the $8,084.04 annuity to be $78,668.30. We have used the same factor, but have eliminated the amounts being paid under the five policies referred to in this paragraph. Our calculation is as follows:

| | |
|---|---|
| Annual payments under Sun Life policy | $3,522.72 |
| Annual payments under the four New York Life policies $\frac{100,000}{160,000} \times \$2,831.64$ | 1,769.77 |
| | 5,292.49 |

$5,292.49 \times 9.73131 = \$51,502.86$.

[7] Lines 5, 6, 7, and 8.

to the Ten Fifteen Chestnut St. Corporation. They were payable to Pearlman's executors, administrators, or assigns until long after he had become insolvent. The $100,000 policy issued by the Sun Life Assurance Co. of Canada to the Ajax Hosiery Mills Co. had been assigned by the latter company to one of its creditors as security for an indebtedness. Petitioner had no rights under it until March 25, 1935, when she was named as principal beneficiary, at which time the insured was hopelessly insolvent.

The first case relied upon by respondent to support his view that the changes of beneficiary were in fraud of creditors is *Appeal of Elliott's Executors*, 50 Pa. 75 (1865). The deceased had effected four policies on his life, each for $10,000, three of which were assigned to a trustee for the benefit of his wife. The three assignments, the court pointed out, "were all voluntary, and would have been good against heirs, devises or legatees; but here the decedent died insolvent, and the question is, are they good against creditors." Holding that they were not, the court said:

> The testator was hopelessly insolvent in 1859 and for some time previous. The insurances were effected in February and March of that year, assigned on 10th September following, he dying two months afterwards, when the policies became due and payable. The assignments do not appear to have been known to the trustee or *cestui que trusts*, certainly not to his creditors, who were apparently first aware of his situation by the developments succeeding his decease. We can therefore have no difficulty in holding these assignments fraudulent and void, and that the proceeds of the policies belong to creditors and estate of the decedent.

The next case cited by respondent is *In re McKown's Estate*, 198 Pa. 96 (1901). McKown had taken out a policy of $10,000 in the Manhattan Life Insurance Co. upon his life, payable to his executors, administrators, or assigns. Ten years later, while insolvent and at a time when he was largely indebted to the issuing company for defalcations while one of its agents, he assigned the policy to his wife. The court held:

> * * * At the time McKown made this voluntary assignment of the policy to his wife, he was admittedly insolvent. The burden of proof is, therefore, upon her to show the bona fide character of the transaction and to repel the presumption of fraudulent intent as to creditors. * * *

The third and principal case is *Fidelity Trust Co.* v. *Union National Bank of Pittsburgh* (1933), 313 Pa. 467; 169 Atl. 209. The facts are quite involved. Briefly, a banker had engaged extensively in speculation, part of which had been unlawful. More than a half million dollars in insurance was paid after his death to trustees for his wife, the assignment of the policies having been made to the trustees at a time prior to his insolvency and no contention having been made that it was fraudulent. The major issue before the court involved three additional policies in the total amount of $275,000, taken out by the

insured in March and April 1929 and assigned to the same trustees in October 1929 after he had become insolvent. The court held that the latter assignments were made "with actual intent, as distinguished from intent presumed by law (Section 7 [Uniform Fraudulent Conveyance Act]) to hinder, delay and defraud creditors. If, however, we did not reach that conclusion, we should be obliged by the record to find that the conveyances are condemned by Sections 4, 5 and 6 [of the same act]."

The court's later recitation of the facts, which need not be repeated here, supports its conclusion. It said, *inter alia:*

The appellee beneficiaries contend that the donor withdrew nothing from his creditors to pay premiums, and that, as creditors had no claims to the loan or cash surrender values of the policies at the time of the conveyances, nothing was taken from them by changing the designation of beneficiary. This argument disregards the true nature of the transaction. Each policy was a chose in action, an obligation to pay the insured's legal representatives on his death if he complied with the conditions of the policy. That obligation was of value to the insured's creditors; he was able to borrow on the policies, and the proceeds, when received by his executors, would help pay his debts. *In re McKown's Estate,* 198 Pa. 96, 47 A. 1111; *In re Huff's Estate,* 299 Pa. 200, 205, 149 A. 179; *Burnet v. Wells,* 289 U. S. 670, 679, 53 S. Ct. 761, 77 L. Ed. 1439. By conveying that asset in fraud of creditors' rights, a constructive trust resulted for their benefit; on familiar principles, applied in tracing trust property, they may follow the asset in whatever form it takes, which, in this case, is the fund in the custody of the trustees.

In October, 1929, the donor could not, with reason, have considered that he had not provided adequate insurance for his wife and children, because they were then, under the trust agreement, the beneficiaries of insurance greatly in excess of $500,000 and his own affairs were in very precarious condition. In addition, his wife was the beneficiary of a $25,000 policy, not deposited under the trust agreement.

From the circumstances referred to, we think only one inference is permissible, and that is that the donor actually intended to deprive his creditors of their expectancies in the policies. No other inference will explain or reasonably account for the gift. The reservation of the right to deal with the policies as his own is some evidence of the actual intent to hinder, delay, and defraud his creditors. If he intended only to benefit his family, it was unnecessary to reserve power to revoke and to appoint to others. Cf. *Mitchell v. Stiles,* 13 Pa. 306, 309.

Petitioner expresses the view that the decision, "solely on the basis of the Fraudulent Conveyance Act, without any consideration of the later act of 1923,[8] which sets forth so definite and important an exception to the Fraudulent Conveyance Act, was completely ununderstandable." She sets out in considerable detail the antecedent history

---

[8] Act of 28 June, 1923 P. L. 884; 40 P. S. 517:

"The net amount payable under any policy of life insurance or under any annuity contract upon the life of any person, heretofore or hereafter made for the benefit of or assigned to the wife or children or dependent relative of such person, shall be exempt from all claims of creditors of such person arising out of or based upon any obligation created after the passage of this act,' whether or not the right to change the named beneficiary is reserved by or permitted to such person."

of the act of 1923 and the decisions under the earlier acts in an attempt
to prove that "the more than fifty years established policy of the state
[is] that the transfer of insurance policies by an insolvent *was to be an
exception* to the Fraudulent Conveyance Act." Whether that is so
can best be determined by examining the later cases by the Supreme
Court of Pennsylvania. *Freuler* v. *Helvering*, 291 U. S. 35; *Blair* v.
*Commissioner*, 300 U. S. 5; *Erie Railroad Co.* v. *Tompkins*, 304 U. S.
64; *Helvering* v. *Stuart*, 317 U. S. 154.

Four cases have been decided by that court since the *Fidelity Trust
Co.* case in which creditors have endeavored to seize the proceeds of
insurance policies because the deceased, while insolvent, had named his
wife as beneficiary in substitution for his estate. In *Stutzman* v.
*Fidelity Mutual Ins. Co.*, 315 Pa. 47 (1934) ; 172 Atl. 302, this had
occurred under the following circumstances: Deceased was heavily
involved financially, but was carrying insurance on his life in an
amount in excess of $100,000. Some of the policies were payable to
his estate and some to his wife. A creditor, by threat of criminal pro-
ceedings, prevailed upon the insured to assign to him—the wife of
the insured joining—policies in which his wife was named as bene-
ficiary, having a cash surrender value of $700. "To restore to his wife
the protection which she lost, the husband immediately * * *
changed the beneficiary in the $25,000 Fidelity policy from his estate
to her." The chancellor found that the purpose of the deceased in
changing the beneficiary was not to defraud creditors and the Supreme
Court of Pennsylvania affirmed, holding that the circumstances to
which we have alluded "distinguish sharply this situation from that
presented" in the cases cited, among which were *In re McKown's
Estate* and *Fidelity Trust Co.* v. *Union National Bank of Pittsburgh*,
*supra*.

In *Potter Title & Trust Co.* v. *Fidelity Trust*, 316 Pa. 316 (1934) ;
175 Atl. 400, the court, in a *per curiam* opinion, said:

The wife and children of every man have an insurable interest in his life,
and the law has always looked with favor on life insurance contracts made for
their comfort and maintenance. From our earliest cases down to the present day
this court has upheld and encouraged such provisions and protected them from
claims of creditors. *Stutzman, Admr.*, v. *Fidelity Ins. Co.*, 315 Pa. 47, 49. In
addition, the legislature has enacted laws for the protection of the wife and
children, as beneficiaries of life insurance policies, from claims of creditors of
the insured (Acts of April 15, 1868, P. L. 103 and June 28, 1923 P. L. 884), and
this benefit inures to them whether the insured was solvent or insolvent, or had
reserved the right to change the beneficiary: *Schaeffer's Estate*, 194 Pa. 420;
*Irving Bank* v. *Alexander*, 280 Pa. 466.

In that case the insured, while insolvent, had executed an insurance
trust for the benefit of his wife, daughter, and sister. Prior to the
execution of the trust the wife had been the named beneficiary in most

of the insurance policies and the daughter had been the named beneficiary in the remainder. The court pointed out that "no change of beneficiary" had been made, with the exception that the sister had been made a contingent beneficiary at the death of the wife and daughter, and held that the creditors had no right to the fund created by the insured's death.

*Newman* v. *Newman, supra*, was a controversy between a widow and the executors of her deceased husband's estate. Policy of insurance had been issued July 11, 1925, the wife being the designated beneficiary. On April 9, 1932, the beneficiary was changed to the executors, administrators, or assigns of the insured and on April 11 the policy was assigned to a bank as collateral security for a loan. On January 4, 1937, the loan was paid and the wife was restored as beneficiary. The executors claimed that the insured was insolvent when the wife was restored as a beneficiary and that such change was an effort, in the words of the affidavit of defense, "to cheat and defraud * * * creditors * * * in violation of the provisions of the Uniform Fraudulent Conveyances Act." The Supreme Court of Pennsylvania said:

> The learned court below held that the affidavit of defense was insufficient. The husband merely restored to the plaintiff the same policy benefit which she had relinquished so long as was necessary to secure the bank's loan to him; when the loan was repaid she was merely put in the position she had occupied before. There is nothing to show bad faith. See *Stutzman, Administrator* v. *Fidelity Insurance Company*, 315 Pa. 47, 172 A. 302. The situation is precisely what it would have been if, instead of formally changing the beneficiary, the wife had originally joined in the assignment as collateral and on payment of the debt the policy had been returned by the bank. Judgment affirmed.

In *Provident Trust Co.* v. *Rothman*, 321 Pa. 177 (1936) ; 183 Atl. 793, the court, in an attachment proceeding brought by creditors against a surviving wife, discussed the Pennsylvania legislation, which culminated in the Act of June 28, 1923, of which the statute relied on by petitioner is a part, and distinguished the *Fidelity Trust Co.* v. *Union National Bank* case, *supra*, upon the ground that "there was not a fraudulent transfer," as there had been in the cited case.

*Landreth* v. *First National Bank*, 346 Pa. 551 (1943) ; 31 Atl. (2d) 161, also cited by petitioner, although involving the right to proceeds of an insurance policy, turned upon the wife's right to stand upon the precise terms of a note which had been executed by her husband prior to his death. The court refused to construe the language making every "debt" or "obligation" of the pledgor due at his death applicable to corporate notes signed by him as a surety and which were not then due. It accordingly found that the widow was entitled to the insurance proceeds, reduced only by the amount borrowed by the insured and secured by the pledged insurance policy.

Each of the parties seems to take an extreme view of the Pennsylvania law. Petitioner argues that the act of 1923 means nothing unless it is construed to mean that it grants an absolute exemption of the insurance proceeds, even though the assignment may have been in fraud of creditors. Respondent appears to believe that the sole test is solvency or insolvency of the insured when the change in beneficiary is made. In our judgment neither view is sound.

In the *Fidelity Trust Co.* v. *Union National Bank* case, *supra*, the court, upon another issue, made specific reference to the statute upon which petitioner relies. Contention was made that insurance policies which had been assigned to a bank as collateral were "within the statutory exemption saving family insurance from creditors." The chancellor had awarded to the plaintiff (administrator *pendente lite*) the difference between the note, with interest, and the stipulated value of the collateral. The court held that the donor had subordinated the contingent beneficial interest theretofore conferred on his family to the extent of the loan and interest; that while the statute exempts insurance payable to the family it does not exempt proceeds payable to a creditor or to creditors and the family; that the creditor's interest is not exempt; and therefore that the asset which the donor "had carved out of what was once an expectancy for his family" "remained where it was, an asset of the donor, which on his death passed to his personal representatives in such amount as the bank might have claimed."

The fact that the court considered and discussed the 1923 statute in that case is convincing evidence it did not deem it to be an insurmountable obstacle to the application of the Uniform Fraudulent Conveyance Act to policies of insurance assigned in fraud of creditors. The later cases, however, indicate that the court did not intend to lay down a rule making every change of beneficiary by an insolvent insured presumptively fraudulent. As we view the cases, the court has given a reasonable construction to both legislative enactments, holding that, while it is the policy of the state to protect a wife and children of an insured, it will not do so when he has been guilty of conduct interdicted by the Fraudulent Conveyance Act.

Was Pearlman guilty of such conduct in naming his wife beneficiary in the five policies under which approximately $200,000 is to be paid by the insurance companies? We are of the opinion he was. The courts of Pennsylvania would so hold in an action brought by creditors or by a representative of his estate. *Fidelity Trust Co.* v. *Union Bank of Pittsburgh, supra*. We are therefore of the opinion and now hold that petitioner is liable as a transferee for the income taxes of her deceased husband.

We have not overlooked the several contentions made by petitioner

upon brief; but in our judgment none of them can change the result. Her reliance upon the state statute of limitations is unsound. The transferee provision of the revenue act contains its own limitation. The one applicable here is "one year after the expiration of the period for assessment against the taxpayer." (Sec. 311 (b) (1), I. R. C.) The liability asserted for the 1940 taxes affirmatively appears to be timely. We can not find on the present record that any of the others were barred. Nor is it material in the instant case that the change in beneficiary occurred before the liability for some of the taxes arose. If the transfer was in fraud of creditors, intended to defraud creditors, or devised as a scheme to defeat the collection of future income taxes, it would be within one or more of the sections of the Fraudulent Conveyance Act and void under the law of Pennsylvania. *Fidelity Trust Co.* v. *Union Bank of Pittsburgh, supra.* Cf. *Harwood* v. *Eaton*, 68 Fed. (2d) 12. Nor need we be concerned with whether the Commissioner, as a result of this proceeding, succeeds in collecting all of his claim while other creditors may not fare so well. Whether he may sequestrate the monthly payments, "compel her to exercise certain options under which she may receive portions of the principal of the insurance fund over a period of years," or distrain upon other property owned by her, is not within our jurisdiction. It may even be (as suggested by the court in *John Hancock Mutual Life Insurance Co.* v. *Helvering, supra*) that the insurance companies are not trustees and that the relationship between them and petitioner is that of debtor-creditor. As to that we express no opinion. Our task is complete when the question of liability is determined.

Since we have held that petitioner is liable as a transferee, the extent of such liability must be determined. In this connection the real question seems to be (see footnote 1) whether the deduction of $8,212.50 each year as accrued interest may be allowed.

Petitioner relies upon *Berryman D. Fincannon*, 2 T. C. 216. In that case the issue was whether commissions earned by an *active* business conducted by the taxpayer were to be included in his gross income in the year earned by the business, its books being kept on an accrual basis, or in the year when they were paid, the taxpayer being on the cash basis. We recognized that two separate systems of accounting could be maintained by the taxpayer, one for his active business and one reflecting his other transactions, and that under the circumstances before us he should have included in his gross income the commissions accrued on the books of his business.

The *Fincannon* case was a practical solution of the problem there dealt with; but it can have no application under the present facts. Pearlman's business, long prior to the taxable years, had become a mere shell, transacting no business and having no real existence. True,

it continued to make postings to accounts which had been set up on its books to show the interest accruing upon the loans from the banks. That, however, in our judgment, was an idle gesture. Clearly, the creditors, at all times, had recognized they were extending the credit to Pearlman, trading as M. M. Pearlman and Co. He was individually liable for the debt. The creditors did not look to the "business" and it would have been futile for them to have done so. Taking the balance sheet of the business at its face, it was insolvent throughout the taxable years. Its principal asset was a "Drawing Account" of Pearlman, ranging from $112,681.76 in 1934 to $272,714.48 in 1940. If the books had been properly kept the amount owing by Pearlman to his business, during most of the period, would have been in excess of a quarter of a million dollars. The business had no net worth, the other property owned by it being furniture and fixtures carried at $2,309.30, a small amount of cash, and a "Loan Receivable" of 1015 Chestnut Corporation, another company of Pearlman, in the amount of $9,664.67. The value of the last mentioned is not shown; but the parties have stipulated that an account payable by the same company to Pearlman and his trustee in the amount of $24,500 had no value on October 21, 1933.

Looking realistically at the situation as it existed throughout the taxable years, the conclusion is inescapable that the interest was Pearlman's. He was on the cash basis and, although he had substantial income, no interest was ever paid. To allow the deduction of $8,212.50 during each of the five years merely because entries were made on the books of an inactive non-entity would be to exalt form above substance. Cf. *Griffiths* v. *Helvering*, 308 U. S. 355, and *Higgins* v. *Smith*, 308 U. S. 473. Whether the "business" could be said to have properly accrued the interest even if it had been active—the other facts being as shown in our findings—is at least debatable. With all due deference to the Circuit Court of Appeals for the Eighth Circuit, we adhere to the view expressed in *Zimmerman Steel Co.*, 45 B. T. A. 1041, notwithstanding the reversal in *Zimmerman Steel Co.* v. *Commissioner*, 130 Fed. (2d) 1011. But the point need not be labored. We hold merely that petitioner has failed to prove that Pearlman was on other than a cash basis or that any amount in excess of that allowed by the respondent may be deducted from his gross income as "interest paid or accrued within the taxable years on indebtedness" within the purview of section 23 (b) of the applicable revenue acts.

Respondent's determination is approved and his request that $1,755.15 additional tax for 1940 be included in petitioner's liability as a transferee is granted.

Reviewed by the Court.

*Decision will be entered under Rule 50.*