TAMPA & GULF COAST RAILROAD COMPANY, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6021–69. Filed September 30, 1971.

*Joe K. Moore*, for the petitioner.
*Marion B. Morton*, for the respondent.

#### OPINION

FORRESTER, *Judge:* All of the facts have been stipulated and are so found.

Respondent determined deficiencies in petitioner's income tax for the years and in the amounts shown below:

| TYE Dec. 31— | Deficiency | TYE Dec. 31— | Deficiency |
|---|---|---|---|
| 1960 | $50, 845. 06 | 1963 | $32, 566. 94 |
| 1961 | 36, 988. 77 | 1964 | 30, 615. 31 |
| 1962 | 33, 102. 85 | | |

Petitioner denies that any tax is owing and claims an overpayment of $4,361.73 for the taxable year ended December 31, 1960.

Concessions having been made, the sole issue remaining for decision is whether petitioner is entitled to deduct accrued but unpaid interest under section 163 [1] on two purported bond issues.

For the years in issue petitioner had its main office in Richmond, Va., and filed Federal income tax returns with the district director of internal revenue in Richmond. However, at the time the petition in this case was filed petitioner's principal place of business was in Jacksonville, Fla. For the years in issue petitioner kept its books and filed its income tax returns on an accrual basis.

Petitioner was incorporated in 1913 under the laws of Florida for the purpose of operating a railroad. Petitioner's original capital totaled $250,000 and was comprised of 2,500 shares of $100 par value common stock. In 1917 all of petitioner's common stock was purchased for $122,011 by Seaboard Air Line Railway Co. (hereinafter referred to as Seaboard or Old Seaboard in view of a subsequent reorganization

---

[1] Unless otherwise specified, all statutory references are to the Internal Revenue Code of 1954.

of this company, described below, from which emerged Seaboard Air Line Railroad Co., hereinafter referred to as Seaboard or New Seaboard).

Petitioner purchased its railroad properties in Florida in 1913 and operated them until January 1, 1927, at which time its entire properties were leased to Seaboard. Seaboard operated petitioner's properties from January 1, 1927, until December 23, 1930, when Seaboard entered bankruptcy proceedings and receivers were appointed. From December 23, 1930, until August 1, 1946, the effective date of the bankruptcy reorganization, Seaboard's receivers operated petitioner's properties under the 1927 lease. New Seaboard operated petitioner's properties from August 1, 1946, until July 1, 1967, under a lease executed in 1946, and amended in 1953. On July 1, 1967, New Seaboard merged with Atlantic Coast Line Railroad Co. to form the present company known as Seaboard Coast Line Railroad Co.

In 1913, shortly after its incorporation, petitioner issued to the public a total of $1,184,000 in 5-percent gold bonds in denominations of $1,000. The bonds were in coupon form, with interest payable semiannually and principal payable 40 years later, in 1953. This bond issue was secured by a first mortgage on all petitioner's property, and payments of interest and principal were later guaranteed by petitioner's parent, Seaboard, as part of the 1927 lease agreement.

Soon after Seaboard entered bankruptcy proceedings in 1930, Seaboard's receivers were permitted by the court to stop rent payments to petitioner under the 1927 lease and to abrogate Seaboard's guarantee of the interest payments on petitioner's first-mortgage bond issue. Seaboard's failure to make rent payments caused petitioner to default on its semiannual interest payments to the holders of the first-mortgage bond issue. A committee was formed by these bondholders which became a party to Seaboard's reorganization proceedings. Petitioner never was itself a party to those proceedings.

As part of Seaboard's reorganization the bondholder's committee exchanged all of petitioner's first-mortgage bonds deposited with it, together with the accompanying claims for defaulted interest, for various security interests in New Seaboard. When the reorganization culminated in 1946 Seaboard had acquired $1,165,000 face amount of petitioner's outstanding $1,184,000 first-mortgage bonds. New Seaboard accumulated another $12,000 of the remaining $19,000 face value of petitioner's first-mortgage bonds on the same terms prior to the due date of the bonds in 1953. New Seaboard retained title to these bonds throughout the taxable years in issue. Petitioner made provision for payment of the remaining $7,000 face amount of its first-mortgage bonds in April 1955.

From time to time after it acquired all of petitioner's common stock in 1917, Seaboard made advances of capital funds to petitioner on open account without interest. By September 1928 these advances were in excess of $600,000. At that time petitioner issued to Seaboard in substitution for $600,000 of the advances one improvement and extension 6-percent gold bond due 25 years later, in 1953. Interest on the bond was payable semiannually and it was secured by a second mortgage on all of petitioner's property. New Seaboard succeeded to Old Seaboard's title to this bond in the bankruptcy reorganization and has retained that title to the present.

The interest due on petitioner's first and second bond issues was initially defaulted in 1930. Interest on both of these bond issues, together with interest on the defaulted interest (hereinafter referred to as penalty interest), has continued in default to the present. Also, the payment of principal on both of these bond issues was defaulted when due in 1953 and has continued in default to the present.

Although New Seaboard has never received a payment of principal or interest on either the first- or second-mortgage bonds, it has not at any time sought to employ the forced-collection procedures authorized in the trust indentures. Article Five of the indenture for the first-mortgage bond issue provides in pertinent part as follows:

### ARTICLE FIVE

#### REMEDIES OF THE TRUSTEES AND BONDHOLDERS

\* \* \* \* \* \* \*

Section 2.—If one or more of the following events, herein called the "events of default," shall happen, that is to say:

(a) Default shall be made in the payment of any interest on any of the bonds, when and as the same shall become payable as therein and herein expressed, and such default shall continue for the period of three months;

(b) Default shall be made in the payment of the principal of any of the bonds when the same shall become due and payable, either by the terms thereof or otherwise as herein provided, or any part thereof;

(c) Default shall be made in the observance or performance of any other of the covenants, conditions and agreements on the part of the Railroad Company, in the bonds or in this indenture contained, and such default shall continue for the period of six months after written notice to the Railroad Company from the Trustees or either of them specifying such default and requiring the same to be remedied;

(d) An order, decree or judgment shall be made for the appointment of a permanent receiver or receivers of the Railroad Company, or of the trust estate; then, and in every such case, the individual Trustee, if the Trustees by written notice to the Railroad Company shall state that the Trustees deem it advisable, by his agents or attorneys, may forthwith enter into or upon all or any part of the trust estate, and may exclude the Railroad Company, its agents and servants, wholly therefrom, and having and holding the same, may use, operate, manage

and control the same and conduct the business thereof, either personally or, by his receivers, agents, servants or attorneys; and upon every such entry, the individual Trustee may, at the expense of the trust estate, from time to time, insure or keep insured the property whereof he shall become possessed as aforesaid, in the same manner and to the same extent that the Railroad Company if then in possession thereof would be bound to insure the same, and likewise may, from time to time, at the expense of the trust estate, make all necessary or proper repairs, renewals, replacements, alterations, extensions, additions, betterments and improvements thereto and thereon that to him may seem judicious; and in such case shall have the right to manage the trust estate and to carry on the business and to exercise all the rights and powers of the Railroad Company, either in the name of the Railroad Company or otherwise, as he shall deem best; and shall be entitled to collect and receive all tolls, earnings, income, rents, issues and profits of the trust estate and every part thereof and of the business conducted therewith; and after deducting the expenses of operating the same and of conducting such business, and of all such repairs, maintenance, renewals, replacements, alterations, betterments, improvements, extensions and additions, and all payments which may be made for taxes, assessments, insurance and prior or other proper charges upon the trust estate or any part thereof, as well as just and reasonable compensation for the services of the Trustees and for the services of all counsel, agents and employees by them or either of them properly engaged and employed, he shall apply the moneys arising as aforesaid as follows:

(a) In case the principal of the bonds shall not have become due, to the payment of the interest as herein provided in the order of the maturity of the instalments of such interest, with interest at the rate of five per cent per annum upon overdue instalments thereof, such payments to be made ratably to the persons entitled thereto without discrimination or preference.

(b) In case the principal of the bonds shall have become due, first, to the payment of the accrued interest (with interest at the rate of five per cent. per annum upon overdue instalments thereof) in the order of the maturity of the instalments, and next, if any surplus remain, towards the payment of the principal of all the bonds, such payments in every instance to be made ratably to the persons entitled thereto without discrimination or preference.

(c) Any surplus remaining after providing for the payments aforesaid and (in case the principal of the bonds shall not have become due) for the payment of the semi-annual instalment of interest upon the bonds then next maturing, shall be paid over to the Railroad Company, its successors or assigns, or to whosoever may be lawfully entitled to receive the same, or as any court of competent jurisdiction may direct.

These provisions, however, are not intended in any wise to modify the provisions of Section 1 of this Article, but are subject thereto.

Upon the payment in full of whatever may be due for principal or interest and be payable for other purposes as aforesaid and after making provision satisfactory to the Trustees for the payment of the semi-annual instalment of interest upon the bonds then next maturing, the trust estate shall be returned to the Railroad Company, and the Railroad Company and the Trustees and each of them (unless all the bonds shall have been paid in full, principal and interest) shall be restored to their former positions and rights hereunder in respect of the trust estate.

Section 3.—In case default shall be made in the payment of any interest on any of the bonds at the time outstanding, and any such default shall have con-

tinued for a period of six months, then and in every case of such continuing default, the Trustees or the corporate Trustee may and upon the written request of the holders of a majority of the bonds then outstanding shall, by notice in writing delivered to the Railroad Company, declare the principal of all the bonds then outstanding to be due and payable immediately; and upon any such declaration the same shall become and be due and payable immediately, anything in this indenture or in the bonds to the contrary notwithstanding. This provision, however, is subject to the condition that if, at any time after the principal of the bonds shall have been so declared due and payable and before any sale of the trust estate shall have been made pursuant to the provisions of this indenture, all interest in arrears upon such bonds, with interest at the rate of five per cent. per annum on overdue instalments of interest, together with the reasonable charges and expenses of the Trustees, their agents and attorneys shall either be paid by the Railroad Company or be collected out of the trust estate, then, and in every such case, the holders of a majority in amount of the bonds, by written notice to the Railroad Company and to the corporate Trustee, may waive such default and rescind and annul such declaration and its consequences, and in that event the trust estate, if in the hands of the individual Trustee or of a receiver appointed hereunder, shall be returned to the Railroad Company; but no such waiver of any particular default shall extend to or affect any other default or impair any right consequent thereon.

Section 4.—If one or more of the events of default shall happen, then and in every such case the Trustees, with or without entry, personally or by attorney, in their discretion either

(a) may sell the trust estate (not including, however, money in the hands of the Trustees, or either of them), and all right, title, interest, claim and demand therein or thereto of the Railroad Company or any one claiming under it, and all right of redemption thereof, to the highest and best bidder, which sale or sales shall be made at public auction, at such place in the City of Tampa, Florida, or at such other place or places, and at such time or times, and upon such terms, as the Trustees may fix and briefly specify in the notice of sale to be given as herein provided, or as may be required by law; or

(b) may proceed to protect and enforce their rights, and the rights of the holders of bonds under this indenture, by a suit or suits in equity or at law, whether for specific performance hereof or of any covenant or agreement contained herein, or in aid of the execution of any power herein granted, or for any foreclosure hereunder, or for the enforcement of any other appropriate legal or equitable remedy as the Trustees, being advised by counsel learned in the law, shall deem most effectual to enforce and protect any of their rights and the rights or interests of the bondholders hereunder.

Section 5.—Upon the written request of the holders of twenty-five per cent. of the bonds then outstanding, in case one or more of the events of default shall happen, it shall be the duty of the Trustees, upon being indemnified as hereinafter provided, to take all steps needful for the protection and enforcement of their rights and the rights of the holders of the bonds and to exercise the power of entry or power of sale hereby conferred, or both, or to institute appropriate judicial proceedings of any kind, as the Trustees, being advised by counsel, shall deem most expedient in the interest of the holders of the bonds. Anything in this indenture contained to the contrary notwithstanding, the holders of a majority of the bonds then outstanding shall have the right from time to time, by directions in writing delivered to the corporate Trustee, to direct and control the method and place of conducting any and all judicial or other proceedings

having for their object any sale of the property hereby mortgaged or pledged or the appointment of a receiver or the foreclosure of this indenture.

Article Seven of the indenture for the second mortgage prescribes comparable remedies for default. Seaboard has not claimed any deduction for bad debt or loss relative to either the first- or second-mortgage bonds.

The 1946 lease between petitioner and New Seaboard provided that petitioner would receive as rent for the use of its properties the sum of the following: (a) The cost of maintaining petitioner's corporate existence; (b) taxes for which petitioner was liable; and (c) costs and expenses of petitioner's operation. The 1953 supplemental lease increased the annual rent by $95,000 plus an amount equal to the depreciation and amortization expenses properly accrued by petitioner each year. Seaboard applied to the Interstate Commerce Commission (ICC) for its approval of the increase in rent. The ICC's decision approving Seaboard's application included the following analysis:

[Seaboard] asserts that the existing rental does not provide * * * [petitioner] with any compensation for use of its properties and deprives both * * * [petitioner] and * * * [Seaboard] of the tax benefits for depreciation and amortization which the Federal Internal Revenue Code otherwise recognizes as appropriate deductions against income from the use of property or the conduct of a business.

\*          \*          \*          \*          \*          \*          \*

[Seaboard] estimates that the payment of the additional rent of approximately $113,000 will result in a reduction of its annual income tax accruals by approximately $60,000. [ICC Finance docket No. 14501, Dec. 7, 1953.]

New Seaboard began rent payments to petitioner under the 1946 lease (as amended in 1953) in 1954. Except for the cost of maintaining the leased properties, this was the first rent payment made to petitioner by either Old Seaboard or New Seaboard since 1930. This rent ($95,000 plus an amount equal to petitioner's depreciation expense) was paid petitioner and reported by it as income in each of the taxable years in issue. New Seaboard deducted the same amount as rent expense in each of these years.

In each of the years in issue petitioner deducted as accrued interest expense on its first- and second-mortgage bonds the respective amounts of $58,850 and $36,000. This total of $94,850 did not include any of the penalty interest which was accumulating with respect to both bond issues. Respondent disallowed these interest deductions, asserting that neither the first nor the second bond issue represented a valid indebtedness on which interest could be deducted.

For the years in issue and prior years Seaboard did not accrue as income the interest owed to it under petitioner's first- and second-mortgage bonds. Seaboard's reason for not reporting interest income

with respect to these bonds was the financial status of petitioner, which Seaboard contended made the possibility of ever receiving such interest too remote to justify accrual. Respondent made no adjustment to Seaboard's handling of this item.

Seaboard did not offset or seek any offset of the rent it paid to petitioner against the interest due from petitioner. However, Seaboard would annually offset against the rent due to petitioner Seaboard's claims for capital improvements made on behalf of petitioner which were beyond the required maintenance of petitioner's leased properties. The remaining net rental was then paid to petitioner.

Petitioner's financial position is revealed by the following information extracted from its balance sheets for the years in issue:

| Dec. 31— | Total assets | Debt in default | Interest in default [1] | Total share-holder's equity |
|---|---|---|---|---|
| 1960 | $2,782,748 | $1,777,000 | $3,589,255 | ($3,538,199) |
| 1961 | 2,830,364 | 1,777,000 | 3,684,105 | (3,523,076) |
| 1962 | 2,903,896 | 1,777,000 | 3,778,955 | (3,510,857) |
| 1963 | 3,107,594 | 1,777,000 | 3,873,805 | (3,501,988) |
| 1964 | 3,096,004 | 1,777,000 | 3,968,655 | (3,499,991) |

[1] The figures in this column do not include the penalty interest also owed by petitioner. The penalty interest in default on the first mortgage alone amounted to $1,700,961 by Dec. 31, 1964.

Petitioner paid $5,819.92 in Federal income tax for 1960, resulting from a capital gain, and paid no income tax for the years 1961 to 1964, inclusive. Petitioner later filed a claim for a refund of $4,361.73 of the tax paid in 1960, based on a carryback of net operating losses from 1961 and 1962 to 1960. Respondent disallowed the refund, claiming that the petitioner had no operating losses in 1961 and 1962 in view of the disallowance of the interest deductions at issue herein.

Section 163(a) allows "as a deduction all interest paid or accrued within the taxable year on indebtedness." The question before us is whether each of petitioner's so-called bond issues in fact represented a valid indebtedness during the years 1960–64, inclusive. If they did not, then respondent's disallowance of the deductions taken by petitioner for accrued but unpaid interest must be sustained.

This is an issue of fact to be decided in light of all the relevant facts and circumstances. *John Kelley Co.* v. *Commissioner*, 326 U.S. 521 (1946). Petitioner must carry the burden of proving that a bona fide indebtedness existed before it can be allowed the interest deductions in issue. *Motel Corp.*, 54 T.C. 1433 (1970). An alleged indebtedness between a parent and its wholly owned subsidiary must withstand particularly exhaustive scrutiny because of the opportunities presented by such a relationship to contrive fictional indebtedness. *Fin Hay Realty Co.* v. *United States*, 398 F. 2d 694 (C.A. 3, 1968), *Cuyuna Realty Co.* v. *United States*, 382 F. 2d 298 (Ct. Cl. 1967).

Petitioner argues the proposition that inability to pay interest obligations is not of itself of sufficient reason to prevent accrual and deduction. This is true. Compare, e.g., *Fahs* v. *Martin*, 224 F. 2d 387 (C.A. 5, 1955) ; *Edward L. Cohen*, 21 T.C. 855 (1954), and Rev. Rul. 70–367, 1970–2 C.B. 37, with *Millar Brainard*, 7 T.C. 1180 (1946), remanded in an unreported decision pursuant to stipulation (C.A. 7, 1947, 36 A.F.T.R. 1544, 47–2 U.S.T.C. par. 9306), and *Florence Pearlman*, 4 T.C. 34, 54 (1944), affd. 153 F. 2d 560 (C.A. 3, 1946). In fact, a taxpayer on the accrual basis must deduct an expense when the taxpayer becomes in all events liable to pay it, whether or not it is actually paid, or the taxpayer will lose the deduction altogether. *Cumberland Glass Manufacturing Co.*, 2 B.T.A. 1122 (1925).

Petitioner's reliance upon the above cases is misplaced. The questions decided in those cases dealt with the application of accrual accounting principles to the determination of taxable income under the Federal Internal Revenue Code. However, before we reach the question of the propriety of petitioner's use of accrual accounting, we must resolve the more fundamental issue of whether any indebtedness existed upon which petitioner's accrual accounting system could operate. If, as respondent contends, the bonds in substance represented equity capital rather than debt, then we need not even reach the accounting issues.

The distinction between debt and equity is not always abundantly clear. Debt is usually defined as an advance which the debtor is legally obligated to repay in all events, whereas equity is generally defined as money which is put to the risk of the venture. See, e.g., *Cuyuna Realty Co.* v. *United States, supra*. These generalities shed little light on the case at hand. However, the cases do set forth several factors which are indicative of either debt or equity, some of which are pertinent to the facts of this case.

Although inability to make interest payments may have little to do with the propriety of accruing interest in the year when due, *supra*, expectation of repayment is clearly a significant factor in judging the validity of a debt.

Expectation of payment at maturity is a good indication of the existence of a debt. This expectation, however, must be more than a theoretical one, and in retrospect if it can be shown that the stockholders making the advances were little concerned about the matter of payment of the principal when due, then the taxpayer's position is greatly weakened. [*Charter Wire, Inc.* v. *United States*, 309 F. 2d 878, 881 (C.A. 7, 1962).]

During and before the years in issue the likelihood that petitioner would ever be able to pay the interest due upon its bonds was minute at best. No interest was paid on either bond issue from 1930 through 1964, the final year in question. The principal of both issues was de-

faulted when due in 1953 and continued in default throughout the years in question. Petitioner was hopelessly insolvent throughout this period. The amount of interest in default rose from $3,589,255 at the end of 1960 to $3,968,655 at the end of 1964. Petitioner adduced no evidence of any plan or arrangement to pay its obligations.

Moreover, the control which Seaboard exercised over petitioner's only source of income—the rent paid by Seaboard for the use of petitioner's railroad properties—made it almost certain that petitioner would never be able to repay the purported debts. The rent was set by the 1946 lease agreement at an amount which offered no hope whatsoever that petitioner would be able to meet its annual interest obligations, much less repay the principal of both bond issues when due in 1953. Seaboard increased the rent in 1953 by two amounts: a sum equal to the depreciation deduction allowable to petitioner, plus $95,000, a sum which very closely corresponds to the annual deduction taken by petitioner for accrued but unpaid interest ($94,850). Petitioner used none of this additional rent to pay its interest obligations. Rather, the money served only to offset petitioner's theretofore unused depreciation and interest deductions. That Seaboard did not expect petitioner to ever pay the interest is demonstrated by Seaboard's failure to accrue the interest as income, on the ground that petitioner's financial plight made the right to receive such interest valueless. From the record we conclude that neither Seaboard nor petitioner could have had any reasonable expectation that petitioner would ever be able to make either interest or principal payments during the years in issue.

Although it is clearly permissible for a corporation to be indebted to its controlling shareholder, *Campbell* v. *Carter Foundation Production Co.*, 322 F. 2d 827 (C.A. 5, 1963), such a dual relationship can be an important factor in determining the validity of a debt and must be examined with special care, as we noted above, to prevent interest deductions from being illegitimately propagated. The true identity of "interest" between Seaboard and petitioner can best be evaluated by asking whether an independent lender would have acted as Seaboard did with respect to petitioner's so-called bond issues.

The indentures for both bond issues provide detailed remedial measures in the case of default on the payment of either interest or principal. Seaboard has manifested no inclination to enforce its creditor's rights.

It is almost inconceivable to us that an independent lender would have been as indulgent with petitioner as was Seaboard. In spite of the staggering totals of defaulted interest and principal, and the dismal prospects for ever receiving any payments in the future, Seaboard

made no attempt to invoke the powers set forth in the indenture agreements. A creditor's failure to enforce its rights upon the default of a debt owed to it by a subsidiary belies the existence of a bona fide indebtedness. *Gooding Amusement Co*, 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957).

The character of indebtedness may vanish when the parent and the subsidiary cease acting like debtors and creditors; perhaps that point is passed when the parent, unlike the reasonable creditor, fails to force the subsidiary into bankruptcy. [*Cuyuna Realty Company* v. *United States, supra* at 302.]

The original intent of the parties is often noted as a factor in determining whether a bona fide indebtedness exists. See, e.g., *Lots, Inc.*, 49 T.C. 541 (1968). However, in a case such as this, where the creation of the instruments is so far removed in time and circumstance from the years in issue, the original intent of the parties loses much of its relevance. *Cuyuna Realty Co.* v. *United States, supra; Jewell Ridge Coal Corporation* v. *Commissioner*, 318 F. 2d 695 (C.A. 4, 1963). We find it unnecessary to decide whether these instruments represented valid indebtedness when they were created, since they so clearly did not represent valid indebtedness during the years in issue.

Another relevant factor is the presence of any unjustified tax avoidance. The purpose of the arrangement in issue appears to have been the reduction of taxes by shifting income from Seaboard to petitioner to take advantage of petitioner's interest deductions on the alleged debt owed Seaboard. The 1953 cash rent was set at a level which almost precisely equaled petitioner's interest deduction. The Interstate Commerce Commission found tax effects to be the motivating force behind the rent increase. Petitioner did not accrue and deduct any penalty interest during the years in issue; it deducted only the regular interest, which was sufficient to offset its rental income. There is no evidence in the record that fair rental value played any part at all in the determination of either the 1946 or the 1953 rent level. Seaboard did not accrue as income the interest that petitioner was accruing as a deduction.

Of course, every taxpayer has the right to do all he can within the law to minimize his taxes. See, e.g., *Gregory* v. *Helvering*, 293 U.S. 465 (1935). However, if a transaction has no substance or purpose apart from avoiding taxes, we must disregard it. *Knetsch* v. *United States*, 364 U.S. 361 (1960). Petitioner has offered no substantial nontax justification for the transactions in issue, and we must conclude that tax avoidance was the sole purpose for the arrangement.

It is true that the indenture agreements relating to the terms of each of the bond issues are true to form. However, as has been stated so often before, substance must prevail over form in the administration

of the Federal internal revenue statutes. See, e.g., *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945).

Petitioner has not met its burden of proving that the bonds, in substance, represented bona fide indebtedness during the years in question. Therefore, respondent was correct in disallowing the interest deductions in issue. Because of consessions,

*Decision will be entered under Rule 50.*