W.B. KILLHOUR SONS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
W. B. Killhour Sons, Inc. v. Commissioner
Docket No. 2500-70.
United States Tax Court
T.C. Memo 1973-183; 1973 Tax Ct. Memo LEXIS 106; 32 T.C.M. (CCH) 855; T.C.M. (RIA) 73183; August 20, 1973, Filed *106 William G. O'Neill, for the petitioner. Mary Ann Hagan, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: Respondent determined deficiencies in petitioner's Federal income tax for the taxable years ended October 31, 1966 and October 31, 1967 in the amounts of $4,582.01 and $4,692, respectively. The sole issue is whether petitioner is entitled to deduct in each of the years interest paid on corporate debentures and a demand note both held by a shareholder of petitioner. 2 FINDINGS OF FACT All of the facts and exhibits stipulated by the parties are adopted as findings and are incorporated by this reference. Petitioner was organized on October 19, 1953, under the laws of the Commonwealth of Pennsylvania. Its principal place of business activity is Philadelphia, Pennsylvania, and its principal business activity is that of a paper distributor selling primarily to printing firms. It filed its Federal income tax returns for the years involved with the district director of internal revenue at Philadelphia, Pennsylvania on the accrual method of accounting. Petitioner is successor to a sole proprietorship which W. B. Killhour *107 established in 1950. Mr. Killhour had previously been president of Quaker City Paper Company. His son, William G. Killhour, was employed in the business in 1950. In late 1950 and early 1951 the proprietorship negotiated to purchase the wholesale paper distribution operation of Industrial Merchant Business Division of the Paper Manufacturers Company. During the negotiations the Killhours became acquainted with respresentatives of Hubbs Corporation which was a wholesale distributor of printing 3 papers and fine papers consisting of two divisions operating in several branches on the east coast. The Killhour proprietorship purchased the Industrial Merchant Business Division and was in turn purchased by Hubbs Corporation and became the W. B. Killhour & Sons Division of Hubbs Corporation. In 1953 Hubbs Corporation experienced financial difficulties and petitioner was organized for the purpose of acquiring the assets of the W. B. Killhour & Sons Division of Hubbs Corporation. Petitioner purchased the fixed assets, inventory, and accounts receivable of the Killhour Division for a total consideration of $437,370.72. The primary sources of funds used by petitioner to purchase the *108 assets were: Common stock issued
$ 80,370.00
5%, 10-year debentures issued
120,000.00
Loans from Girard Bank
198,937.50
$399,307.50
Petitioner was incorporated with authorized capital of 12,500 shares of $10 par value common stock. The Killhours determined, after consulting with bankers and others, that $80,000 in issued capital stock would be adequate capitalization. The initial issue of 8,037 shares of $10 par value common stock was issued to the following individuals for cash: 4 Shareholder
Number of Shares W. B. Killhour
6,000
Jean G. Killhour (wife of W. B. Killhour)
1,200
William G. Killhour
802
Robert B. Killhour (son of W. B. & Jean G. Killhour)
15
David F. Maxwell
10
M. Elizabeth Wheeler
10
8,037
The balance sheet of petitioner as of November 1, 1953, was as follows: ASSETS:
Cash in Bank
$120,239.65
Accounts Receivable
182,607.60
Inventories
212,716.34
Total Current Assets
$515,563.59
Machinery and Equipment
$35,442.58
Furniture and Fixtures
13,491.15
$48,933.73
Less, Reserve for Depreciation
10,511.69
38,422.04
Miscellaneous Receivables:
Officers and Employees
$ 1,231.80
Others
301.65
1,533.45
Prepaid Insurance Premiums
1,607.35
Leasehold Improvements
483.94 $557,610.37
LIABILITIES:
Due Hubbs Corporation for purchase of assets
$357,240.37
(Balance)
Five percent Debenture Bonds due 1963
120,000.00
$477,240.37
CAPITAL:
Capital Stock, Common, Par Value $10 per $ 80,370.00
share, Authorized 12,500 Shares, Outstanding
$557,610.37
8,037 Shares
*109 The debentures of petitioner aggregating $120,000 in face value were purchased by Mrs. Killhour with her separate funds. Mrs. Killhour inherited stocks and bonds worth $123,543.42 and cash of $6,000 upon the death of her parents in 1937. She maintained an extensive portfolio of stocks and bonds until 1953 when she sold her corporate stocks and used the proceeds to buy the $120,000 face value of petitioner's debentures. She retained the corporate bonds which she had inherited. She sold her stocks and invested the proceeds in the debentures because she felt insecure owning stocks which fluctuated in value and she preferred fixed interest payments rather than the uncertainty of dividends on the stocks. She had confidence in the business acumen of her husband because of his long experience in the paper business and had confidence in her sons who were employed by petitioner. She believed that her investment in the debentures of petitioner was secure and sound. The debentures issued to Mrs. Killhour on November 1, 1953 were in denominations of $500 and bore the following language: 6 W. B. KILLHOUR & SONS, INCORPORATED
CERTIFICATE OF DEBENTURE $500.00 Ten Year 5% Debenture
*110 W. B. Killhour & Sons, Incorporated, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, hereinafter referred to as Corporation, for value received, hereby promises to pay to - Jean Gherky Killhour - or assigns, on November 1, 1963, at the office of Corporation, Philadelaphia, Pennsylvania, the principal sum of $500.00, and to pay interest thereon at the rate of five per cent (5%) per annum, from November 1, 1953 until payment of said principal sum or until conversion as hereinafter provided. The total principal amount of this debenture issue is $120,000.00. All or any part of the total principal amount of this debenture then outstanding may be redeemed by Corporation in units of five hundred dollars ($500.00) on any interest date at par together with all interest which may then be accrued and unpaid, provided that Corporation shall give not less than fifteen days' written notice of such redemption to each registered owner thereof, Corporation shall make said redemption payment to said owner upon the surrender of this Certificate of Debenture duly endorsed by said owner at the offices of Corporation. Notice duly given by Corporation shall *111 stop the running of interest as of the applicable interest date. In the event that Corporation redeems less than the entire amount of this debenture issue of $120,000.00, said redemption shall be pro rata or by lot among all the registered owners thereof, as the Board of Directors of Corporation may in its discretion determine. This debenture is convertible at the option of the registered owner hereof at any time prior to maturity or redemption by Corporation as aforesaid, upon surrender of this certificate duly endorsed by said owner at the office of Corporation, upon the basis of fifty-five (55) fully paid and non-assessable shares of the $10.00 par common stock of Corporation for each five hundred dollars ($500.00) of principal hereof. The Secretary of Corporation shall maintain a registry containing the name and address of each owner of this debenture issue together with the certificate numbers and principal amounts thereof issued. This debenture certificate may be transferred in whole units of five hundred dollars ($500.00) at any time by the then registered owner hereof upon presentation of this certificate duly endorsed for transfer together with such other instruments *112 as may be required by law to the Secretary of Corporation. A new certificate will thereupon be issued to the transferee. The holder of this debenture certificate takes same subject to a certain Subordination Agreement between the obligor (Corporation), the holder, and Girard Trust Corn Exchange Bank, dated December 8, 1953. IN WITNESS WHEREOF, W. B. Killhour & Sons, Incorporated has caused this instrument to be signed by its President, attested by its Secretary and its corporate seal to be hereunto affixed this (Date) W. B. KILLHOUR & SONS, INCORPORATED
Attest: 7 The debentures were unsecured. The subordination agreement referred to in the debentures between petitioner and Girard Trust Corn Exchange Bank (Girard) was required by Girard when petitioner borrowed the funds used to purchase the assets of the W. B. Killhour & Sons Division from Hubbs Corporation. The loans from Girard were made on December 8, 1953, and consisted of $100,000 in short-term credit payable in 90 days and a five year, 5% installment note for $100,000 requiring quarterly installments. The loan instrument between Girard and petitioner covering the $100,000 installment note contained the *113 following provisions: Borrower further covenants that it will not, without the written consent of Bank, (a) borrow from anyone except Bank, or sell receivables; (b) permit its net working capital to be less than $225,000 (the sum of $20,000 payable during the succeeding twelve months as installments on the note to be treated as a quick liability in computing net working capital); (c) permit its current indebtedness to exceed $300,000 (said sum of $20,000 likewise to be treated as current indebtedness in this computation); (d) declare any dividend, except stock dividends, or make any other payment on or to acquire its stock; (e) enter into any merger or consolidation or dispose of substantially all of its assets; (f) expend or become obligated to expend more than $1,500 in any fiscal year for fixed assets; (g) become 8 liable on the obligation of anyone else, except by the endorsement of negotiable instruments for deposit or collection in the ordinary course of business; and (h) make any loan to any person excepting loans to employees, which shall at no time exceed in the aggregate the sum of $1,000. The subordination agreement between Girard and petitioner was as follows: *114 SUBORDINATION AGREEMENT Agreement dated December 8, 1953, between JEAN GHERKY KILLHOUR (hereinafter called "Debentureholder"); W. B. KILLHOUR & SONS INCORPORATED, (hereinafter called "Borrower"); and GIRARD TRUST CORN EXCHANGE BANK. WHEREAS, Borrower has outstanding $120,000 of Ten Year 5% Debentures, all of which are held by Debentureholder; and Borrower has requested Bank to extend credit to Borrower, which Bank is willing to do, provided Debentureholder agrees that the debentures shall be subordinated to Borrower's note in the amount of $100,000 dated December 8, 1953, executed pursuant to a Term Loan Agreement between Borrower and Bank dated December 8, 1953, and to all of Borrower's other liabilities to Bank; NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, agree as follows: 1. (a) "Debentures" means Borrower's Ten Year 5% debentures (b) "Liabilities" means the indebtedness of Borrower to Bank evidenced by said note, and all other liabilities (primary, secondary, direct, contingent, sole, joint or several) and interest thereon, now or hereafter contracted or acquired, of Borrower and/or Borrower and others to Bank. 9 2. Debentureholder *115 hereby subordinates all claims arising out of the debentures to all liabilities.Bank shall first be paid all of such liabilities before Debentureholder shall be paid anything by Borrower on account of the principal of the debentures. With respect to any of the liabilities Bank may at any time, without notice to Debentureholder, (a) renew or extend the time of payment of all or any part thereof, (b) increase or reduce the amount thereof, (c) accept collateral security therefor, (d) release any party primarily or secondarily liable thereon, and (e) release all of any part of any collateral held by Bank as security therefor. 3. Debentureholder will not demand or accept, and Borrower will not pay any part of the principal of (or after default by Borrower on any liability, of the interest on) the debentures, and Debentureholder will not demand or accept, and Borrower will not give, any security for the debentures, until all liabilities have been paid in full. 4. Debentureholder approves in advance any note or agreement between Borrower and Bank and waives notices of any default by Borrower. 5. In case of any distribution of the assets of Borrower to its creditors, under the *116 Bankruptcy Act or any similar Federal or state statute, or by virtue of receivership or other court proceeding, assignment for benefit of creditors, liquidation, dissolution, or otherwise, all dividends and payments on account of the debentures shall be payable to Bank until all liabilities have been paid in full, and Debentureholder assigns to Bank all such dividends and payments. If any such dividends or payments come into the possession of Debentureholder, she will receive them as trustee for Bank and will immediately pay them to Bank. Bank is authorized (but is not required) to execute and file any and all proofs of claim in the name and on behalf of Debentureholder and to receive any such dividends or payments. 10 If the total of such dividends and payments, plus all dividends and payments received directly by Bank, exceeds the total of all the liabilities, Bank shall immediately distribute such excess to Debentureholder, or, if at the time the debentures have been transferred to two or more other persons, among the then holders of the debentures in proportion to the face amount of debentures then owned by them. 6. Debentureholder and Borrower will cause the debentures *117 to contain a paragraph reading substantially as follows: "The holder of this debenture certificate takes same subject to a certain Subordination Agreement between the obligor (Corporation), the holder, and Girard Trust Corn Exchange Bank, dated December 8, 1953," and Borrower will cause all future debenture certificates issued to any transferee thereof to contain a similar provision, and will require the holder thereof to assent to this agreement. 7. If Debentureholder or Borrower violate any provision of this agreement Bank, at its option, may declare all liabilities immediately due and payable, and may forthwith proceed against Borrower for the collection thereof. Upon demand by Bank, Debentureholder will immediately deliver to Bank any property received in violation of this agreement. 8. If this agreement becomes inoperative because of the payment of all of the liabilities, it shall not be terminated, but shall again become operative whenever any new liability shall come into existence. 9. This agreement may be terminated by Debentureholder by delivering to Bank a written notice of termination, but no such termination shall place the debentures on a parity with the *118 liabilities existing at the time of such notice. 11 10. This agreement shall be binding upon the respective heirs, personal representatives, successors and assigns of the parties hereto. IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first above written. /S/ Jean Gherky Killhour/Debentureholder (Seal)
W. B. KILLHOUR & SONS, INCORPORATED
By/S/ W. B. Killhour, Pres. Attest /S/William G. Killhour/Treas. GIRARD TRUST CORN EXCHANGE BANK By /S/ [Signature illegible] Attest /S/ [Signature illegible] The short-term note of $100,000 to Girard was repaid in March 1954. In 1958 petitioner paid its final installment on the $100,000 five year loan from Girard.Thereafter, petitioner was not restricted in any way from paying cash dividends. Petitioner had an open line of credit from Girard of $100,000 which was increased to $150,000 in the 1950's, then to $175,000. In the early 1960's it was increased to $200,000 and by 1966 it was $250,000. This credit has been utilizied by petitioner for current operating needs. Petitioner also had an open line of credit of $100,000 from Philadelphia National Bank which required 12 no *119 subordination agreement. Petitioner has not utilized the credit available to the maximum extent possible from Girard and has utilizied the credit available from Philadelphia National Bank only to the extent of 40%. The debentures issued to Mrs. Killhour became due and payable on November 1, 1963. On June 25, 1963 petitioner and Mrs. Killhour extended the maturity date to November 1, 1968, deleted the conversion privilege, and increased the interest rate from 5% to 7%. Petitioner and Mrs. Killhour orally agreed to extend the maturity date from November 1, 1968 to November 1, 1971, which they reduced to writing on December 17, 1968 and they likewise extended the maturity date from November 1, 1971 to November 1, 1973. On December 27, 1965 Mrs. Killhour advanced cash of $25,000 to petitioner which petitioner needed in order to secure additional funds from Girard. Petitioner issued a 5-1/2% unsecured demand note; however, the note should have provided for interest payable at the rate of the prime interest rate as that was the agreement of the parties. The funds which the loan from Mrs. Killhour permitted petitioner to borrow from Girard were used to increase the inventory of *120 paper stock to satisfy an increase in customer demand. 13 A subordination agreement was executed with respect to this loan in favor of Girard Trust and it was, for the purposes of this case, identical to the subordination agreement which related to the debentures. When the debentures first became due on November 1, 1963, the petitioner could have retired the debt if it borrowed the necessary funds and it would have had to negotiate with Girard with respect to the subordination agreement or repay the loan outstanding to Girard Trust. An elderly uncle of Mrs. Killhour's expressed a willingness to lend funds to petitioner. In addition, a member of the board of directors indicated a desire to lend petitioner some funds. The officers of petitioner have not retired any of the debt owed to Mrs. Killhour, but, instead, have retained the maximum funds available for expansion. Petitioner has maintained a line of credit in excess of current operating needs in order to meet needs for expansion.Petitioner has paid no dividends since incorporation. It established no sinking fund for the purpose of retiring debts to Mrs. Killhour. At various times petitioner negotiated for possible *121 acquisitions and in 1968 it acquired the Sanitary Paper Division of D. L. Ward Company. It purchased warehouse and office property at a cost of $43,000 for its York, Pennsylvania branch in 1958. 14 In addition to the outstanding debentures held by Mrs. Killhour and the $25,000 demand note payable to her, petitioner had outstanding short-term and long-term notes payable at the end of each of its following October 31 fiscal years: Year
Amount 1954
$ 135,000.00
1955
120,000.00
1956
120,000.00
1957
115,000.00
1958
85,000.00
1959
85,000.00
19 60
120,000.00
1961
115,000.00
1962
186,685.99
1963
185,629.36
1964
204,507.53
1965
243,316.49
1966
212,052.00
1967
120,709.51
Petitioner had cash in its bank accounts at the end of each fiscal year ended on October 31 as follows: Year
Amount 1954
$ 22,341.55
1955
31,582.64
1956
12,172.95
1957
14,296.69
1958
23,294.42
1959 26,371.16
1960
31,235.06
1961
32,236.61
1962
25,309.21
1963
36,641.64
1964
26,147.55
1965
33,604.95
1966
23,101.91
1967
32,615.68 15 At the end of each of the fiscal years (October 31) set forth above petitioner owned no *122 marketable securities, certificates of deposit or government obligations which could be readily converted into cash. Instead, its assets other than cash consisted primarily of land, buildings, accounts receivable and inventory. The debentures and note payable to Mrs. Killhour were reflected as such on the books and records of petitioner. Interest was timely paid. There has been no retirement of the debentures and nothing has been repaid on the demand note. The subordination agreement in favor of Girard relating to the $25,000 demand note to Mrs. Killhour was released in 1969. The subordination agreement in favor of Girard, which relates to all debt to Girard was canceled shortly before the trial of this case. The statutory notice of deficiency involved herein was mailed to petitioner on February 2, 1970. Petitioner was advised by counsel not to repay any of the indebtedness to Mrs. Killhour pending final disposition of this case. Mrs. Killhour has made no demand for repayment. If the debentures were retired or the note repaid she would be required to reinvest the repaid sums. She is satisfied 16 with owning the debentures and holding the note because the rates *123 of interest are adequate and she has full confidence in the management and operations of petitioner which are under the direction of her two sons. Petitioner has been a profitable enterprise since 1954. Its gross annual sales have increased from $1.7 million in 1954, to $3.2 million in 1967, and its net worth is presently almost five times the initial net worth. Petitioner's retained earnings at the end of its fiscal years in 1966 and 1967 were in the amounts of $192,012.51 and $209,437.96, respectively. The taxable income and earned surplus of petitioner for the taxable years ended October 31, 1955 through October 31, 1967, were as follows: Fiscal Year Ending
Taxable Income
Earned Surplus 1955
$14,007.50
$ 3,747.62
1956
32,387.99
24,793.86
1957
16,460.13
36,639,83
1958
12,332.03
44,889.91 1959
19,061.16
56,763.21
1960
15,245.52
66,548.58
1961
12,809.37
102,388.17
1962
24,890.21
119,041.72
1963
44,6 95.05
145,215.58
1964
4,264.64
147,977.73
1965
19,026.91
163,293.99
1966
42,727.92
192,012.51
1967
25,355.88
209,437.96 17 Petitioner's total liabilities and owner's equity at the end of each of the following fiscal *124 years were as follows: Fiscal Year Ending
Total liabilities
Owner's Equity 1955
$373,743.07
$ 89,300.00
1956
395,335.99
101,300.00
1957
493,327.22
101,600.00
1958
441,571.78
101,600.00
1959
376,977.58
101,600.0 0
1960
383,825.98
101,850.00
1961
393,097.92
102,850.00
1962
477,897.00
101,850.00
1963 532,876.94
101,850.00
1964
481,127.62
101,850.00
1965
587,412.02
101,850.00
1966
598,896.23
99,850.00
1967
421,538.99
99,850.00
At the time the debentures were issued to Mrs. Killhour, she owned 1,200 shares of petitioner, or approximately 14% of the total issued and outstanding stock. In May 1956, Mrs. Killhour purchased an additional 520 shares of petitioner's stock. When W. B. Killhour died on May 15, 1961, Mrs. Killhour inherited 6,200 shares of petitioner. This gave her approximately 60% of the outstanding stock. Mrs. Killhour made gifts of her stock in petitioner to her sons and their families beginning after the death of W. B. Killhour. On February 7, 1966, the issued and outstanding stock of petitioner was held as follows: 18 Shareholder
Shares Jean Gherky Killhour
5,820
William G. Killhour
2,102
C. Lewis Van Leer
175
Elizabeth W. Salvador
10
David F. Maxwell
10
Robert B. Killhour
1,265
Josephine G. Killhour
300
Total
9,682
*125 Since the date of incorporation of petitioner, Mrs. Killhour worked for petitioner as a part time employee. Upon the death of her husband in 1961 she took a more active part in the business, working three days per week, analyzing accounts and doing research. She was paid a salary for her work. In 1961 Mrs. Killhour was elected chairman of the board of directors, but the active management of petitioner remained in her two sons. ULTIMATE FINDINGS OF FACT The $120,000 debentures issued by petitioner to Mrs. Killhour and the $25,000 demand note of petitioner payable to Mrs. Killhour do not represent valid debts. OPINION The sole issue to be decided is whether petitioner is entitled to deduct interest paid on debentures and a promissory note held by its principal shareholder. Interest is deductible under the provisions of section 19 163(a) of the Internal Revenue Code of 1954, as amended, if it is paid on indebtedness. In his statutory notice of deficiency the Commissioner determined that the debentures and promissory note both represented capital investments not indebtedness and, therefore, the amounts deducted as interest constituted dividends.
*126 The issue is one of fact and although the case law provides us with certain tests to apply, the countless variations in facts necessarily precludes finding a case in point. There is no single characteristic which is decisive in the determination of whether a debt exists or an additional risk investment has been made by the shareholder. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). The burden of proving "the reality of the indebtedness" is on the taxpayer. Trans-Atlantic v. Commissioner, 469 F.2d 1189, 1191 (C.A. 3, 1972), affirming a Memorandum Opinion of this Court.
The United States Court of Appeals for the Third Circuit, to which an appeal in this case would lie, has set forth 16 criteria by which to judge whether a debt or capital investments exists. Fin Hay Realty Co. v. United States, 398 F.2d 694, 696 (C.A. 3, 1968). We shall examine the applicability of each of these criteria to the facts involved here. 20 1. The Intent of the Parties. - There can be no dispute as to the intent of the parties if we look solely to the legal instruments. The parties utilized debt instruments conventional in form to evidence their *127 intent to create debts. If the attendant circumstances are to the contrary this test is not conclusive. Kraft Foods Co. v. Commissioner, 232 F.2d 118 (C.A. 2, 1956), reversing 21 T.C. 513. 2. The Identity Between Creditors and Shareholders. - There is no relationship between stock holdings and holders of the debt instruments in the instant case. Only one shareholder held the debentures and promissory note. 3.The Extent of Participation in Management by the Holder of the Instrument. - Although Mrs. Killhour was elected chairman of the board of directors of petitioner in 1961 upon the death of her husband, we believe that she had very little to do with the management of petitioner. This holds true for the entire corporate history. She performed some services for petitioner both before and after her husband died for which she was paid a salary, but we are convinced that the management of petitioner rested in her husband until his death and then in her two sons. 21 4. The Ability of the Corporation to Obtain Funds From Outside Sources. - Petitioner offered no specific evidence on this criterion for the taxable years in issue. When the years *128 in issue are far removed from the date the instruments are created, the relevance of the facts at the time the instruments are created is diminished. Tampa & Gulf Coast Railroad Co., 56 T.C. 1393 (1971), affd. per curiam 469 F.2d 263 (C.A. 5, 1972). A rule that the original intention of the parties should control the character of an instrument for all time would be completely inconsistent with the purpose of the statute. Interest, like an ordinary business expense, is allowed as a deduction from income because it is a cost of producing income. It ceases to be a real cost, if with the passage of time it becomes apparent that the parties have no intention of continuing the debtor-creditor relationship. Cuyuna Realty Co. v. United States, 180 Ct. Cl. 879, 885 (1967), 382 F.2d 298, 301 (1967). At the time the instruments were created, petitioner was being organized and, although the Killhours were experienced in the paper business, the success of petitioner was not an absolute certainty. The situation during the years in issue was much different than it was after the first year of operations as demonstrated by the taxable income, owner's *129 equity, earned surplus and total liabilities as shown below: 22 Years Ended October 31
Taxable Income
Owner's Equity
Earned Surplus
Total Liabilities 1955
$14,007.50
$89,300.00
$ 3,747.62
$ 373,743.07
1966
42,727.92
99,850.00
192,012.51
598,896.23
1967
25,355.88
99,850.00
209,437.96
421,538.99
These differences would certainly affect a prospective lender's opinion as to the risk involved in lending petitioner additional funds. From 1953 to 1967 the total liabilities of petitioner fluctuated between $373,743.07 and $598,896.23. An open line of credit of $100,000 from Philadelphia National Bank was available but utilized only to the extent of 40%. In the business cycle of petitioner it required borrowed funds to take advantage of customer discounts. It borrowed such funds from time to time from Girard under its open line of credit. In the later 1950's Girard expanded petitioner's open line of credit from $100,000 to $150,000, then to $175,000. In the early 1960's it was increased to $200,000 and by 1966 it was $250,000. Petitioner's proof as to the availability of funds from outside sources is not very satisfactory. There was *130 testimony that in 1963 when the debentures became due petitioner could have borrowed funds from Mrs. Killhour's elderly uncle, and also testimony that a director of petitioner would lend funds to petitioner. Petitioner never applied to Girard for long-term financing in excess of the $100,000 it borrowed in 1953. 23 The president of petitioner testified that petitioner did not explore lines of credit available to retire the debentures held by Mrs. Killhour because she desired the interest income from the debentures and the corporate officers saw no reason to deprive her of it. The borrowing power of petitioner with Girard must not have been overwhelming on December 27, 1965 because petitioner was required to borrow $25,000 from Mrs. Killhour on a demand note in order to secure additional funds from Girard. Another family loan or a loan from a director doesn't mean much and there is little to be inferred from the record that a lending institution would be interested in making a long-term loan to petitioner during 1966 or 1967. 5. The "Thinness" of the Capital Structure in Relation to Debt. - Respondent does not contend that petitioner was thinly capitalized nor do *131 we so find. 6. The Risk Involved. - The risk of loss of principal was not great here. From the growth of the business before and after Mrs. Killhour's death there seemed to be little likelihood that the business would fail and petitioner would be liquidated. Mrs. Killhour could not even 24 recall at trial if the debentures were secured by collateral. Of course they were not, nor was the $25,000 promissory note. Nevertheless, all of the funds represented by the debentures and the promissory note held by Mrs. Killhour were placed at the risk of the business. At no time did petitioner have investments outside the business. Cash in the bank fluctuated between $12,172.95 and $36,641.64 from 1954 through 1967. Obviously petitioner needed the funds represented by the debentures and promissory notes. 7. The Formal Indicia of the Arrangement. - Except for minor oversights, such as the interest rate on the promissory note and oral extensions of the debentures followed by written extensions, none of which we deem significant, the parties followed the formal indicia of the arrangement. 8. The Relative Position of the Obligees as to Other Creditors Regarding the Payment of *132 Interest and Principal. - This test points to one of respondent's primary concerns in this case - the subordination agreements with Girard. When the debentures were issued to Mrs. Killhour in 1953, a subordination agreement was executed by Mrs. Killhour, petitioner and Girard. It subordinated 25 all claims arising out of the debentures to all liabilities of petitioner to Girard. It prohibited payment of any of the principal of the debentures prior to payment of all liabilities to Girard but did not prohibit payment of interest on the debentures. This agreement remained in full force and effect until shortly before the trial of this case. When petitioner issued its demand promissory note for $25,000 to Mrs. Killhour in 1965, a subordination agreement was executed by Mrs. Killhour, petitioner and Girard. It was in substantially the same language as the subordination agreement executed in 1953. This agreement was released in 1969. For the taxable years in issue, ended October 31, 1966 and October 31, 1967, both of the subordination agreements were in full force and effect. The Third Circuit has commented upon the effect of subordination agreements in circumstances *133 similar to those involved here in several cases. The most recent pronouncement is contained in Trans-Atlantic Co. v. Commissioner, supra. The Court stated at page 1194: 26 However, much of the importance of subordination depends on the presence of other elements. * * * Where the equity is substantial and where the business prospects are such that there is a reasonable prospect of repayment, subordination and proportionate ownership are certainly not conclusive. * * * Subordination to other creditors not only wipes out a most significant characteristic of the creditor-debtor relationship, the right to share in the event of dissolution or liquidation, but it also destroys another basic attribute of creditor status; i.e., the power to demand payment at a fixed maturity date. P. M. Finance Corp. v. Commissioner, 302 F.2d 786, 789 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court. In the instant case, during the years before the Court the debentures were not due but their maturity had been extended for five years in 1963, and both the debentures and the $25,000 promissory demand note were subordinated to all of the indebtedness of petitioner *134 to Girard. At the ends of the taxable years involved petitioner had outstanding the following liabilities: 27 October 31, 1966
October 31, 1967 Accounts Payable
$196,748.98
$128,779.21
Mortgages, notes, bonds payable in less than 1 year (less demand note of $25,000 to Mrs. Killhour)
196,272.20
106,423.74
Mortgages, notes, bonds payable in 1 year or more (less debentures outstanding)
15,779.80
14,285.77
Other Liabilities
45,095.25
26,050.27
Total
$453,896.23
$275,538.99
The record is far from satisfactory as to existing indebtedness in the taxable years involved. The president of petitioner testified that the $100,000 line of credit to Philadelphia National Bank was never utilized in excess of 40%, so, giving the petitioner the benefit of the doubt (which is hardly required as the burden of proof is on petitioner), $40,000 in each of the years was owed to Philadelphia National Bank. A further assumption made in favor of petitioner is that none of the "other liabilities" shown on the balance sheets of petitioner's income tax returns for the taxable years involved were liabilities to Girard. After applying such assumptions most favorably *135 to petitioner we conclude that the amounts owed to Girard to which the debentures and demand note to Mrs. Killhour ($120,000 + $25,000) aggregating $145,000 would be subordinated was $172,052 for the taxable year ended October 31, 1966 and $80,709.51 for the taxable year ended October 31, 1967. 28 The claims of other creditors of petitioner with whom Mrs. Killhour would have to share the assets in the event of liquidation of petitioner at the end of each of the taxable years involved would be $281,844.23 for the taxable year ended October 31, 1966 and $194,829.48 for the taxable year ended October 31, 1967. The assets available to satisfy such obligations on the respective dates are as follows: October 31, 1966
October 31, 1967 Cash in Bank
$ 23,101.91
$ 32,615.68
Trade notes and accounts receivable
441,313.97
328,621.74
Inventories
330,850.00
268,884.47
Buildings and fixed depreciable assets less depreciation
67,106.16
73,042.61
Land
4,000.00
4,000.00
Other Assets
8,447.31
10,554.72
Total
$874,819.35
$717,719.22
Also included on the balance sheets of petitioners for the years involved was an item for intangible amortizable assets. *136 We have no evidence as to what such assets were nor do we have any evidence as to the fair market values of any of the assets listed above. Land and buildings were possibly worth more than their respective book values and the trade accounts receivable and inventories were probably worth considerably less than their book values. Rather than speculate as to their values, we will, for purposes of illustration, use the book values. 29 The effect of subordination of the debentures and $25,000 promissory note to the obligations to Girard can best be illustrated as follows: October 31, 1966
October 31, 1967 Assets available upon liquidation
$874,819.35
$717,719.22
Less liquidation preferences to Girard
172,052.00
80,709.51
Available for general creditors
702,767.35
637,009.71
Amounts owed to general creditors, including Mrs. Killhour
$426,844.25
$339,829.48
As noted from the lists of assets set forth above, there was relatively little cash in the banks in relationship to the debt outstanding. The bulk of the value of the assets were reflected in accounts receivable and inventory. It is highly unlikely that such assets, when liquidated, would *137 produce cash in any amount near their book values. We conclude, therefore, that the subordination agreements had a material effect on the collectibility of the debentures and the $25,000 promissory note. We recognize that our conclusion is based upon assumptions we have been forced to make from facts ferreted out of the record but petitioner can hardly complain. The importance of subordination agreements was stressed by the 30 Third Circuit in P.M. Finance Corp., supra, and petitioner could have adduced proof, if any exists, to show that the subordination agreements had no material effect on the collectibility of the debentures or promissory note. We know that this test alone is not conclusive of the issue but is damaging to petitioner's position. 9. The Voting Power of the Holder of the Instrument. - Mrs. Killhour, during the years in issue, held approximately 60% of the voting power of petitioner. 10. The Provisions of a Fixed Rate of Interest. - The debentures bore a fixed rate of interest which was increased when their maturity was extended in 1963 at the time the conversion privilege was deleted. The $25,000 promissory note bore interest at the *138 rate of the prime interest rate. 11. A Contingency on the Obligation to Repay. - The promises to repay the debentures and note were unconditional. 12. The Source of the Interest Payments. - Presumably the interest was paid from current operating revenue. However, such revenue could have been utilized for the purposes that it was necessary to borrow funds for, rather than being used for the payment of interest. 31 13. The Presence or Absence of a Fixed Maturity Date. - The debentures had a fixed maturity date of November 1, 1963; this was extended to November 1, 1968, to November 1, 1971, and to November 1, 1973. The promissory note for $25,000 was a demand note. 14. A Provision for Redemption by the Corporation. - The debenture certificates provided for redemption of the debentures upon 15 days notice to the registered owners thereof. If less than the entire issue of $120,000 in debentures were redeemed, the redemption was to be by lot or pro rata, as the board of directors, in its discretion, directed. 15. A Provision for Redemption at the Option of the Holder. - The debenture certificates contained no provision for redemption at the option of the holder.
*139 16. The Timing of the Advance with Reference to the Organization of the Corporation. - The debenture issue was an integral part of organization of the petitioner and the funds provided by the sale of the debentures were used to acquire the fixed assets, accounts receivable and inventory with which petitioner commenced its business. The promissory note for $25,000 was not connected with the incorporation of petitioner. 32 At the time the debentures were issued, the funds which their sale provided to petitioner were committed to the risk of the business. We recognize that the Killhours were experienced in the paper business and they were to operate an established business. Nevertheless, it was a business heavily in debt which has not recovered from being heavily in debt some 20 years later. This permanent need of petitioner for the funds produced by the sale of the debentures is even more apparent when Mrs. Killhour lent petitioner $25,000 in 1965 in order for petitioner to obtain additional loans at Girard. Although the president of petitioner testified that petitioner was able to redeem the debentures when they first became due in 1963, we are not persuaded by *140 his testimony. The balance sheets of petitioner for the fiscal years ended October 31, 1954 through October 31, 1967 indicate that petitioner has never had cash available to retire the debt. Fin Hay Realty Co. v. United States, supra. Petitioner continues to borrow funds at the banks for operating needs. P.M. Finance Corp. v. Commissioner, supra.We see nothing during the taxable years involved here (taxable years ended October 31, 33 1966 and October 31, 1967) which indicates any more likelihood of repayment than in earlier years. In fact, it looked less likely because the restrictions on the payment of dividends expired in 1958. United States v. Snyder Bros. Co., 367 F.2d 980 (C.A. 5, 1966).
The economic possibility of repayment is an important factor in examining the realities of the transactions. Fin Hay Realty Co. v. United States, supra. Petitioner established no sinking fund nor did it make it any other type of provision to enable it to redeem the debentures. United States v. Snyder Bros. Co., supra; Moughan v. Commissioner, 329 F.2d 399 (C.A. 6, 1964) affirming a Memorandum Opinion *141 of this Court. It would be necessary for petitioner to borrow funds for the purpose of repaying Mrs. Killhour. Gooding Amusement Co. v., Commissioner, 236 F.2d 159 (C.A. 6, 1956), affirming 23 T.C. 408 (1954). It is difficult to find that Mrs. Killhour expected to be repaid by petitioner. She did not desire repayment and petitioner, when the debentures first became due, did not desire to repay her because it would deprive her of a source of income. She testified that she never considered that the debentures should be paid off. 34 Expectation of payment at maturity is a good indication of the existence of a debt. This expectation, however, must be more than a theoretical one, and in retrospect if it can be shown that the stockholders making the advances were little concerned about the matter of payment of the principal when due, then the taxpayer's position is greatly weakened. Charter Wire, Inc. v. United States, 309 F.2d 878, 881 (C.A. 7, 1962). This is a significant factor in judging the validity of a debt. Tampa & Gulf Coast Railroad Co., 56 T.C. 1393, 1400 (1971). Although Mrs. Killhour testified that she *142 wanted the security of the debentures, as we pointed out above, she was unable to recall whether the debentures were secured or unsecured. We conclude that the primary type of security she desired was that of a fixed rate of return on investment payable before dividends on common stock. We feel her desires could have easily been satisfied with cumulative preferred stock. The cases relied upon by petitioner are factually distinguishable and they set forth no principles of law inconsistent with these which we have applied here. Applying all of the tests which Third Circuit prescribed in Fin Hay Realty Co. v. United States, supra, we conclude that the debentures and promissory note 35 held by Mrs. Killhour did not represent valid indebtedness of petitioner during the taxable years ended October 31, 1966 and October 31, 1967, and the payments of interest on the debentures and note constituted dividends rather than deductible interest. Decision will be entered for the respondent.