SNYDER BROTHERS COMPANY, INC. v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Snyder Bros. Co. v. Commissioner
Docket Nos. 7307-76, 876-77.
United States Tax Court
T.C. Memo 1980-275; 1980 Tax Ct. Memo LEXIS 312; 40 T.C.M. (CCH) 762; T.C.M. (RIA) 80275; July 28, 1980, Filed Albert W. Crago, pro se. Edward P. Phillips, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies *313 in petitioner's Federal income taxes as follows: Docket Nos. [1]
Fiscal Year
Deficiency
7307-76
Aug. 31, 1972
$25,533
Aug. 31, 1973
28,080
876-77
Aug. 31, 1974
19,047
After certain concessions, the following issues remain for our consideration: (1) whether petitioner is entitled to an interest deduction for payments made on debentures it issued; (2) whether any part of the compensation paid by petitioner to Frank Snyder and Lloyd Snyder constituted unreasonable compensation; (3) whether petitioner is entitled to a deduction for accounting and legal fees paid in connection with the redemption by petitioner of its shares held by one of its shareholders; (4) whether petitioner is entitled to a deduction for the costs of leasing an automobile used by one of its employee-shareholders; and (5) whether petitioner has shown that certain depreciable assets have a shorter useful life than that determined by respondent. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached *314 thereto, are incorporated herein by this reference. Snyder Brothers Company, Inc. (hereinafter "petitioner" or "Snyder Brothers") filed Federal income tax returns for its fiscal years ending August 31, 1972, 1973, and 1974 with the Internal Revenue Service Center, Chamblee, Georgia. At the time it filed its petitions herein, Snyder Brothers' principal place of business was Toccoa, Georgia. Snyder Brothers is primarily engaged in the business of manufacturing industrial furniture finishes. It has three plants, all in Toccoa; one produces lacquers, one produces stains, fillers, and glazers, and one produces varnishes and does mill grinding. Interest Deduction
Prior to its incorporation in 1957, Snyder Brothers did business as a partnership and was owned and operated by Frank Snyder and Floyd Snyder, who were brothers. Upon its incorporation in 1957, Frank Snyder and Floyd Snyder transferred the assets of the partnership, which had a fair market value of $450,382.87, to Snyder Brothers Co., Inc., in exchange for capital stock having a par value of $100,000 and securities entitled "subordinated debentures" (hereafter called debentures) in the principal amount of $140,000. *315 The debentures consisted of 28 separate instruments each in the principal amount of $5,000. Snyder Brothers also assumed liabilities of the partnership in the amount of $202,568.13. The capital stock consisted of 10,000 shares of Class A, par value $1, and 90,000 shares of Class B, par value $1. The excess of the book value of the assets transferred to the corporation over the sum of the liabilities assumed, the par value of the stock issued and the stated principal amount of the "subordinated debentures" issued, amounting to $7,814.74, were shown on the corporation's books as "paid in surplus." The capital stock and debentures were divided equally between Frank Snyder and Floyd Snyder. Thus, Frank Snyder and Floyd Snyder each received debentures in the principal amount of $70,000 and 5,000 shares of Class A and 45,000 shares of Class B common stock. The total principal amount of debentures, $140,000, was to be paid 20 years from date with interest at 6 percent per annum payable seminannually, without, however, the right to acceleration of the entire indebtedness upon default of interest payments. The debentures provided expressly that they should be subordinated to all indebtedness *316 of the corporation, whether already incurred or to be incurred at any time, in the future. No limit was placed upon the amount of such prior indebtedness. No limit was placed on the payment of dividends to stockholders. The right of all other creditors to receive payment in full of principal and interest on their claims was provided for in case of liquidation, bankruptcy or insolvency, or in the event of a default in payment of interest or principal to the holders of the debentures. The debentures could be transferred only on the books of the company by proper written assignment executed by the registered holder and presentation of the debenture at the office of the company. In other respects the debentures were in the form of an absolute promise to pay a fixed principal sum 20 years from date. [2]
Subsequent to the issuance of these istruments, petitioner made the required semiannual payments. These payments were shown as "interest" on petitioner's books and petitioner sought *317 to deduct the payments as interest for Federal income tax purposes. The government disallowed these deductions on the ground that the "subordinated debentures" did not truly represent an "indebtedness," within the meaning of section 163(a) of the Internal Revenue Code of 1954, [3] but rather represented an investment in the company in the nature of stock. Petitioner paid the assessed deficiency and in due course instituted suit for refund in Federal district court. The trial court directed a verdict in favor of petitioner and the government appealed to the Fifth Circuit Court of Appeals. That court reversed the district court and held in favor of the government. United States v. Snyder Brothers Company, 367 F.2d 980 (5th Cir. 1966), cert. den. 386 U.S. 956 (1967). Subsequent to the years involved in the first Snyder Brothers case, Frank and Floyd each transferred their debentures, as gifts to individuals or as conveyances to trusts, as follows: Frank Snyder's Transferees
Number of
Principal
Debentures
Amount
Lynn Snyder
7
$35,000
Sheryl Snyder
7
35,000
Total
14
$70,000
Floyd Snyder's Transferees
Floyd Snyder II
4
$20,000
Carol Lee Snyder
4
20,000
Darrell Snyder
4
20,000
Trust Company of
Ga., Trustee for
Mrs. Minnie P. Snyder
1
5,000
Trust Company of
Ga., Trustee for
Floyd Snyder
1
5,000
Total
14
$70,000
*318 Sheryl then irrevocably placed her debentures and certain shares of Snyder Brothers stock along with other property in a trust i which the Trust Company of Georgia was named trustee. Under the terms of the trust, the trustee was directed to withhold any action seeking the collection of interest or principal upon the Snyder Brothers debentures unless Sheryl so directed in writing. Floyd Snyder II, Carol Lee Snyder, and Darrell Snyder are the children of Floyd Snyder. Minnie P. Snyder was the wife of Floyd Snyder. Lynn Snyder and Sheryl Snyder are the children of Frak Snyder. Marilyn Snyder is the daughter of Lynn Snyder. On March 31, 1972, Lynn Snyder transferred to the Trust Company of Georgia, as trustee for Sheryl Snyder, debentures 15, 16, 17 and 18 (each in the principal amount of $5,000) in exchange for 1,359 shares of Class B common stock of Snyder Brothers that were held by the Trust Company of Georgia as trustee for Sheryl Snyder. Fourteen of the twenty-eight outstanding debentures were redeemed by Snyder Brothers from time to time prior to June 23, 1972. Of the remaining fourteen debentures, after the sale by Lynn Snyder of the four debentures, three remained *319 in Lynn's name and eleven were held in trust for Sheryl. Floyd Snyder died in 1963. After his death, his Class A and Class B common stock of Snyder Brothers passed to the Trust Company of Georgia, as trustee for his estate. During the period immediately followed Floyd Snyder's death, Frank Snyder acquired 89 shares of the 5,000 shares of Class A common stock of Snyder Brothers that previously had been held by Floyd Snyder. In 1965, the Trust Company of Georgia, as trustee for the Estate of Floyd Snyder, transferred to Snyder Brothers for $300,000 the remaining 4,911 shares of Class A common stock and the 45,000 shares of Class B common stock of Snyder Brothers previously held by Floyd Snyder. At various times prior to August 31, 1972, Frank Snyder made gifts of various amounts of his Class B common stock to Lynn Snyder, Marilyn Snyder, and Sheryl Snyder. On August 31, 1972, Frank Snyder sold all of his remaining Class A and Class B common stock of Snyder Brothers to Lynn Snyder and to Snyder Brothers. Floyd Croxton is the only person to have owned shares who was not related by blood or marriage to Frank Snyder or Floyd Snyder. The various amounts of Class A common shares *320 of Snyder Brothers owned by Croxton were at all times less than five percent of the total number of Class A common shares of Snyder Brothers outstanding. Croxton never owned any Class B common shares of Snyder Brothers. Petitioner claimed deductions in each of the years in issue for interest paid on the debentures. In the notice of deficiency, respondent determined that the interest claimed on the debentures was nondeductible because the debentures represented equity rather than debt. In his answer to petitioner's petition, respondent asserted that petitioner was collaterally estopped by the decision in United States v. Snyder Brothers Company, supra, from litigating the disallowance. Reasonable Compensation
Frank Snyder is a chemical engineer experienced in the coatings industry. All of the finishes manufactured by Snyder Brothers are custom-made and designed especially for each customer's need. Frank supervised the analyzing and testing of each product to ensure it met the customer's requirements. At a stockholder's meeting of Snyder Brothers held on May 16, 1967, its bylaws were amended to provide that the general affairs of the company should *321 be managed and conducted by a board of directors. Frank was then elected chairman of the board and his son, Lynn, was elected president. The chairman had sole authority to borrow and sell assets, as well as control over the employment of skilled labor. The president had charge of day-to-day operations. In 1968, because of his health and age, Frank began phasing out his active duties at Snyder Brothers and gradually began turning over the responsibilities of running the company to Lynn. His salary was reduced from $36,000 to $33,000 and in the next few years, as his daily responsibilities continued to be decreased, his salary was reduced to $28,000. Lynn Snyder majored in business administration and chemistry in college. After serving in the Army, Lynn went to work for Snyder Brothers in its laboratory at $14,000 per year. At the time Lynn became president in 1967, Snyder Brothers had a $250,000 debt which it had incurred to purchase Floyd Snyder's stock in 1965 from the trustee of his estate. Under the terms of this loan, Lynn's salary was frozen. The loan was repaid in 1970. Snyder Brothers also had accumulated over $80,000 in bad debts which Lynn decided to write *322 off upon becoming president. He also dismissed the sales manager and technical director and took over their responsibilities. Although Lynn later hired another sales manager, the salesmen still reported to him because the sales manager was often on the road. The company's accountant, plant engineer, plant superintendent and chemists also reported directly to Lynn. Additionally, Lynn, a pilot, was available to fly directly to customers' or potential customers' factories to help solve problems that arose on assembly lines. This ability to reach customers quickly was an important competitive advantage that Lynn provided his customers. Lynn has developed several products that have been trade-named. He has not only been active in the development of new products but also prices each customer's product individually since each item is custom-made. Snyder Brothers' sales manager was paid between one and one-half to two percent of the company's sales. The three plant managers and plant engineer also received bonuses of between $2,000-$4,000 annually when the company was doing well. Most of Lynn's salary was received as a bonus at the end of the year, and in a good year Lynn was *323 paid 3-1/2 percent of net sales. This percentage was based upon Snyder Brothers' accountant, review of executive compensation of other companies with comparable sales to Snyder Brothers in the Almanac of Business and Industrial Financial Ratios, 1973 edition. The portion of the study dealing with manufacturers of paints and allied products showed that for the accounting period July 1969 to June 1970 for such businesses with assets in the range of $500,000 to $1,000,000 the ratio of compensation of officers to net sales was 3.4 percent, and for businesses with assets from $1,000,000 to $5,000,000 the ratio was 3.2 percent. A study of the total compensation received in 1974 by chief executive officers of corporations manufacturing non-durable goods, including industries engaged in chemicals and petroleums, food products, paper products, publishing, and textiles, published by the Financial Executive Institute, Inc., shows the following: BONUS
NON-BONUS
COMPANIES
COMPANIES
SALES
Average
Average
Total
Total
VOLUME
Base Salary
Bonus
Compensation
Compensation
($ Millions)
($ Thousands)
($ Thousands)
Under 10
43.2
14.6
58.0
*
10-25
60.2
31.8
91.9
70.0
25-50
71.6
21.6
93.2
66.2
50-100
69.7
24.4
94.0
108.8
100-200
94. 0
33.8
127.8
73.0
200-500
126.0
53.8
179.8
119.1
500-1000
151.3
62.5
213.8
150.0
1000-2000
208.1
97.8
305.9
*
2000-5000
207.8
114.7
322.5
245.0
5000 and over
*
*
*
*
All levels
121.0
52.9
173.9
104.8
*324 The total compensation (including salary and bonuses, but not including deferred compensations plans) received by various officers of Snyder Brothers in the years ended August 31, 1962 through August 31, 1974 is set forth below: Year ended
August 31
Floyd Snyder
Frank Snyder
Lynn Snyder
Floyd
Croxton
1962
$30,000.00
$ 30,000.00
1963
10,000.00
30,000.00
1964
30,000.00
1965
36,000.00
$10,038.00
$15,000.00
1966
36,000.00
12,150.00
18,000.00
1967
36,000.00
14,600.00
18,000.00
1968
36 ,000.00
28,600.00
19,500.00
1969
33,000.00
28,600.00
1970
28,000.00
28,600.00
1971
28,000.00
45,818.00
1972
28,000.00
70,000.00
1973
88,000.00
91,500.00
Snyder Brothers also contributed various amounts on behalf of Lynn Snyder to a deferred compensation plan called Snyder Brothers Profit Sharing Plan in the years ended August 31, 1972, 1973 and 1974. Total amounts deducted on petitioner's returns for profit-sharing plans totaled $5,000, $15,000 and $5,832 in its *325 fiscal years ending August 31, 1972, 1973, and 1974, respectively. Respondent determined that reasonable compensation for Lynn was only $45,000, $50,000, and $56,000 for the fiscal years ending August 31, 1972, 1973, and 1974, respectively. He also determined that reasonable compensation for Frank was only $17,000 in the fiscal year ending August 31, 1972. [4]
Al Crago worked at Snyder Brothers about 20 hours per week and managed Lynn Snyder's office during the years in issue. He was also Snyder Brothers' accountant. Crago's compensation was $14,487, $14,079 and $16,000 during Snyder Brothers' fiscal years ending August 31, 1972, 1973 and 1974, respectively. Crago charged petitioner on an hourly basis of $9/hour for office management and normal accounting functions but charged $15/hour for special work. Financial data prepared from Snyder Brothers' income tax returns show the following *326 information: Additions
Fiscal
to
Year
Retained
Total
Net
Net
Officers'
Ending
Earnings
Assets
Sales
Profit
Salaries
9/30/67
$ 1,084
$1,103,201
$1,813,562
$53,106
$68,600
9/30/68
26,610
791,232
1,956,648
55,699
84,100
9/30/69
31,461
776,593 1,756,916
65,781
61,600
9/30/70
23,778
812,266
1,757,914
50,011
56,600
8/31/71
34,330
904,443
1,814,753
64,5 89
73,818
8/31/72
64,024
1,019,973
2,360,574
102,938
98,000
8/31/73
58,604
1,092,241
2,577,890
95,531
88,000
8/31/74
26,739
1,186,199
2,959,901
138,747 FIFO
91,500
24,966 LIFO
From the time of its incorporation in 1957 through the end of its year ended August 31, 1974, Snyder Brothers did not pay any dividends to the holders of its Class A or Class B common shares. Lynn also owned and operated a tree farm. He worked on the farm only one weekend every month. Accounting and Legal Fees
Snyder Brothers paid the accounting firm of Bates, Betts, Felton and Carter $1,750 in November 1972, for accounting services in connection with the transfer of Frank Snyder's shares of Snyder Brothers to Snyder Brothers. Snyder Brothers also paid *327 the law firm of McClure, Ramsey and Struble $888 in March 1973 for legal services in connection with the transfer of Frank's shares of Snyder Brothers to Snyder Brothers and to Lynn Snyder. Respondent disallowed Snyder Brothers' claimed deduction for the $2,638 legal and accounting fees paid in connection with these transfers.
Use of Cadillac
Snyder Brothers furnished a leased cadillac to Frank Snyder During its fiscal year ended August 31, 1972. Respondent disallowed a deduction for petitioner's lease payments of $2,476. Depreciable Life of Assets
In the statutory notice of deficiency, respondent determined that the costs of shelving, tanks, a dust arrestor, and paving, which petitioner deducted as repair expenses in the fiscal years ending August 31, 1972 and 1973, must be capitalized and depreciated over a period of 10 years. Petitioner conceded that the amounts must be capitalized but at trial placed in issue the useful life of the property. ULTIMATE FINDINGS OF FACT (1) Compensation paid to Lynn Snyder by petitioner in its fiscal years 1972, 1973 and 1974 was reasonable compensation for his services. (2) Compensation paid by petitioner to Frank Snyder *328 in Petitioner's fiscal year ended August 31, 1972 was not reasonable compensation to the extent it exceeded $17,000. (3) The useful life of the paving done by petitioner was four years; the useful life of the other improvements at issue herein was ten years. OPINION Interest on Debentures
In his answer, respondent affirmatively pleaded that petitioner is collaterally estopped from litigating the issue of whether the debentures constitute bona fide indebtednesses by virtue of the decision rendered by the Fifth Circuit Court of Appeals in United States v. Snyder Brothers Company, 367 F.2d 980 (5th Cir. 1966), cert. den. 386 U.S. 956 (1967). As we recently stated in Lea, Inc. v. Commissioner, 69 T.C. 762, 765 (1978): Generally, if a claim relating to a particular tax year is litigated, the judgment thereon acts as collateral estoppel in litigation over another tax year with respect to matters actually litigated in the first proceeding. The estoppel applies only to those matters in the later proceeding which were actually presented *329 and determined in the first suit.See Commissioner v. Sunnen, 333 U.S. 591, 598-599 (1948). This rule relieves the Government and the taxpayer of the burden of repetitious litigation over identical questions.Id. The burden of proving that petitioner is estopped from relitigating the tax consequences * * * is upon respondent. Rule 142(a), Tax Court Rules of Practice and Procedure.In order to meet his burden, respondent must prove that the issue raised herein has previously been presented and determined by a court of competent jurisdiction and that there has been no subsequent modification of the significant facts nor a change or development in the controlling legal principles which might make the prior determination obsolete or erroneous, at least for future purposes. Commissioner v. Sunnen,supra.See also Tait v. Western Md. Ry. Co.,289 U.S. 620 (1933). We must now analyze the Circuit Court of Appeals opinion in Snyder Brothers Company, supra.The court first noted that the identity of ownership of the debentures and the stockholders' equity, while not alone preventing the advance from being treated as an indebtedness, *330 was a circumstance to be considered. The court regarded the subordination of the indebtedness to all other creditors as a factor to be considered, although not decisive standing alone. Continuing, the court stated: The difficulty here is that this is not simply a case of an attempt to create a debt relationship between the sole stockholders and their corporation, nor is it simply a case of a debenture being subordinated to other creditors. It is both of these things.Moreover, it contains a number of other characteristics which, when taken together, we conclude go farther towards eliminating any difference between the holders of these debentures and preferred stockholders than any case that has been called to our attention. One of these is the long term (20 years) of the debentures; another is the fact that they are unsecured; another is the absence of any limitations on the amount of payment of dividends and the absence of provision for any sinking fund or reserve out of which payment after all other obligations are paid, can be reasonably assured.
Here the government lays great stress upon the fact that the provisions of these debentures relating to the subordination *331 of this obligation to pay off all other creditors of the company whenever such other debts are created, make practically ineffectual what otherwise appears to be an absolute obligation to pay interest regularly and to pay the principal on a specified date. It is plain, as the government points out, that the holders of the "debentures" are practically helpless if the Snyder Bros. Company should decide, for any reason, not to pay interest when due or the principal on its maturity date. In such event, the company is under contractual obligation to notify all the existing creditors, and all of the outstanding debts of the company, whether of later maturity date or not, automatically become due and payable in advance of any payments to the debenture holders. Whether this would, in fact, be a means by which the company could coerce the debenture holders into agreeing to an extension of the otherwise specific dates of payment, it is plain that the hazard of forcing collection upon default makes much less certain that the debentures will be paid off in accordance with their terms than is apparent simply from the face of the debentures themselves. [United States v. Snyder Brothers Company, supra at 983-985; *332 footnote omitted.] The court also noted that the funds for which the debentures were exchanged were used as "initial funds to start the corporate life." There is no dispute that the issue presented here was previously litigated. Nor does petitioner contend that there has been a change or development in the legal principles applied by the Fifth Circuit in the prior case. See, e.g. Slappey Drive Ind. Park v. United States, 561 F.2d 572 (5th Cir. 1977). Rather, petitioner contends that the facts underlying the Fifth Circuit's rationale have significantly changed. In particular, petitioner maintains that when Lynn Snyder transferred the four debentures to the Trust Company of Georgia as trustee for Sheryl Snyder in exchange for common stock on March 31, 1972, the debentures no longer should have been regarded as equity but instead became bona fide indebtedness. [5]
*333 It is petitioner's position that if one looks to this sale date to determine the debt-equity issue, there is only a 5-1/2-year period before the debentures become due rather than the 20-year period as of the time the debentures were first issued; further, the Trust Company of Georgia, which, as trustee, held these debentures, is an independent third party (without any equity interest in Snyder Brothers) which would act to enforce the terms of the debentures. Respondent argues that any change in the ownership of the debentures or stock is irrelevant since the question of whether the debentures constitute debt or equity must be determined at the time they were issued.While we do not adopt such a broad proposition and leave open the possibility that a substantial change in the material facts may change notes once considered an equity interest into bona fide debt, we agree with respondent on the facts here. Cf. Cuyana Realty Co. V. United States, 180 Ct.Cl. 879, 382 F.2d 298 (1967); Tampa Gulf Coast Railroad Co. v. Commissioner, 56 T.C. 1393 (1971), affd. 469 F.2d 263 (5th Cir. 1972); Edwards v. Commissioner, 50 T.C. 220 (1968), *334 revd. 415 F.2d 578 (10th Cir. 1969). The debentures in the principal amount of $140,000 were owned one-half by Frank Snyder and one-half by Floyd Snyder in the factual situation present in the first Snyder Brothers case. Subsequent to that case, Frank transferred his debentures to his children, Lynn Snyder and Sheryl Snyder, as gifts. Later Lynn Snyder transferred these debentures to his sister, Sheryl Snyder, in exchange for certain Snyder Brothers stock which Sheryl held. The exchange between Lynn Snyder and Sheryl Snyder was carried out indirectly through a trustee, however, since Sheryl Snyder's shares were held for her in trust. Also subsequent to the first Snyder Brothers case, Floyd Snyder transferred his debentures, partly as gifts to his children and partly as conveyances into trusts created either for his own benefit or the benefit of his wife. By June 23, 1972, all of these debentures had been redeemed. Petitioner relies heavily upon the changes in ownership of the debentures as creating a materially different factual environment than obtained at the time of petitioner's formation and in the previous litigation. In United States v. Snyder Brothers Company, supra, *335 the Fifth Circuit based its determination primarily upon the subordination provisions of the debentures and the perceived "attempt to create a debt relationship between the sole stockholders and their corporation * * *." 367 F.2d at 987. In the instant case all of the subordination aspects of the debentures remain unchanged. Petitioner contends, however, that because the debentures were no longer owned by the same persons and in the same proportions as the stock ownership, [6] the debt relationship is no longer "between the sole stockholders and their corporation" in the same context in which the bona fides of the debt was suspect when it was first issued. In effect petitioner is arguing that the interests of the debt holders (particularly Sheryl Snyder) now differ from the interests of the equity holders (primarily Lynn Snyder), and that the debt holders would have an incentive to enforce their rights under the debentures, an incentive found lacking in the previous Snyder Brothers case. While we are not convinced that the change in this factor *336 alone would be sufficient to alter the result reached in the previous litigation (since even an independent third party debenture holder would be subject to the severe restrictions on rights to demand payment), we need not decide that question since we do not believe that the changes in ownership within the Snyder family were sufficient to overcome the "taint" associated with the original issuance to Lloyd and Frank Snyder. In this connection we note that the identity of stockholder and debt holder continues in the case of the debentures held by Lynn Snyder. With respect to the debentures held in trust for Sheryl Snyder, we take particular note of the fact that under the terms of the trust, the trustee was prohibited from bringing any action seeking the collection of interest or principal unless Sheryl so directed in writing. This factor not only eliminates the independence of the trustee, which might otherwise have been significant, but it also tends to show that enforcement of whatever rights existed under the debentures was never intended. Therefore, we hold that the changes in ownership of the debentures did not constitute a material change in the facts underlying the decision *337 in United States v. Snyder Brothers Company. [7]
Alternatively, petitioner apparently argues that when Frank Snyder sold all of his stock in Snyder Brothers to Lynn Snyder on August 31, 1972, the debentures were included in the sale as a bona fide debt; that it could have borrowed funds from another third-party source (at higher interest rates) to immediately pay off the debentures and the interest on this new loan would have been deductible; and that the reason for not paying off the debentures at the time of sale was to not jeopardize Snyder Brothers' credit status. Petitioner's argument proves too much. First, we note that the intent of the parties to create debt rather than equity, while a factor to be considered, is not dispositive. Slappey Drive Ind. Park v. United States, supra; Harlan v. United States, 409 F.2d 904 (5th Cir. 1969); Smyers v. Commissioner, 57 T.C. 189, 196 (1971). *338 Second, the fact that petitioner did not refinance the debentures, in order to preserve its credit status, indicates that the debentures had less impact on such credit status (i.e., were less like debt) than alternative bank financing would have had.A potential creditor dealing with petitioner would not be concerned with the effect of the debentures on petitioner's credit worthiness since any sums it ever loaned petitioner would have priority over the debentures. If, however, Snyder Brothers had obtained a bona fide loan from a bank to redeem the outstanding debentures, its credit status would have been affected. Snyder Brothers' balance sheet would have shown a liability to the bank for $70,000 (the outstanding debentures as of August 31, 1972). This liability would probably have priority over most future loans petitioner might receive. In addition, as a condition for obtaining the loan, the bank might have required petitioner to pledge property as collateral. It follows that a potential creditor dealing with petitioner would be concerned by the $70,000 liability of petitioner to the bank, whereas he would not have been concerned with the $70,000 liability on the debentures. In *339 short, the fact that these debentures did not jeopardize or affect the credit worthiness of petitioner is another factor indicating that the debentures are not bona fide debt. Accordingly, we sustain respondent's disallowance of the deduction for interest on the debentures. Reasonable Compensation
Snyder Brothers paid Lynn a salary of $70,000 in its fiscal year ending August 31, 1972, $88,000 in the fiscal year ending August 31, 1973, and $91,500 in the fiscal year ending August 31, 1974. Respondent determined that reasonable compensation to Lynn was $45,000, $50,000 and $56,000 in petitioner's fiscal years ending August 31, 1972, 1973, and 1974, respectively. Snyder Brothers also paid Frank a salary of $28,000 in its fiscal year ending August 31, 1972. Respondent determined that only $17,000 of this amount was reasonable compensation. Whether payments constitute reasonable compensation for service performed and therefore are deductible under section 162(a)(1) is a question of fact to be determined from all the facts and circumstances. Charles Schneider & Co., Inc. v. Commissioner, 500 F.2d 148 (8th Cir. 1974), *340 affg. T.C. Memo. 1973-130; Pacific Grains, Inc. v. Commissioner, 399 F.2d 603 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694 (1977); Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 61 T.C. 564 (1974), affd. 528 F.2d 176 (10th Cir. 1975). Where the employee receiving the salary controls the corporation and can determine his own compensation, we must closely scrutinize the arrangement to determine whether the alleged compensation is in fact a distribution of corporate profits. Darco Realty Corporation v. Commissioner, 301 F.2d 190, 191 (2d Cir. 1962), affg. T.C. Memo. 1961-110; Laure v. Commissioner, 70 T.C. 1087 (1978); Levenson & Klein, Inc. v. Commissioner, supra.The burden of showing that the compensation was reasonable is, of course, on petitioner. Botany Worsted Mills v. United States, 278 U.S. 282 (1929). Both parties rely on the studies of compensation paid to other officers of corporations. Laure v. Commissioner, supra; *341 section 1.162-7(b)(3), Income Tax Regs. Petitioner relies heavily on the Almanac of Business Industrial Financial Ratios study which shows that for the accounting period July 1969 through June 1970, manufacturing concerns of paints and allied products with assets of $500,000 to $1,000,000 had total compensation of officers of 3.4 percent of net sales and pension benefits of.5 percent of net sales. For concerns with assets of $1,000,000 - $5,000,000, total compensation of officers was 3.2 percent of net sales and pension benefits were an additional.9 percent of net sales. Snyder Brothers had net sales of $2,360,574, $2,577,890, and $2,959,901 in the fiscal years ending August 31, 1972, 1973, and 1974, respectively. Snyder Brothers' assets were in excess of $1,000,000 in each of these years. Based upon 3.2 percent of net sales rather than the 3.4 percent petitioner used, total compensation to officers would be $75,538, $82,492, and $94,717 for each of the years, rather than the $98,000, $88,000 and $91,500 that paid. [8]
*342 Respondent first contends that the survey presents only a guide and is not an absolute standard; that the survey does not take into consideration the cost of living in Toccoa, Georgia as compared to the average, or how experienced the officers are. We agree with respondent that such studies are not dispositive, and factors may show that a particular employee should receive a higher or lower than average salary. Neither party introduced any evidence of geographical considerations or, for that matter, much other information into the record from which we could draw such non-statistical inferences. Respondent next argues that Crago's duties made him the equivalent of a corporate officer and his salary should be included in the total officer compensation. Unfortunately, Crago's specific duties at Snyder Brothers are largely unstated in the record. He was the office manager and performed Snyder Brothers' normal accounting function, but he did this part-time and charged hourly rates. We cannot say on this record that Crago should be regarded as an officer for statistical purposes. Respondent also counters the Almanac study with the Financial Executive Institute study of the total *343 compensation received in 1974 by chief executive officers of corporations manufacturing nondurable goods. This report shows that of companies with sales volume of under $10,000,000 the average total compensation, including bonuses, of the chief executive officer was $58,000. Both parties, of course, point to Lynn's various duties and responsibilities, as well as the value of Lynn to the company, to support their respective positions. Petitioner also points to the fact that its sales manager made between 1-1/2 - 2 percent of net sales. Respondent emphasizes the fact that Snyder Brothers has never paid any dividends, Dielectric Materials Co. v. Commissioner, 57 T.C. 587, 591 (1972), although petitioner contends that this failure was due to business needs. We do not think it is necessary to analyze in depth any further the various arguments presented by the parties or all the various factors which we have considered. On the basis of the entire record, we have found, and we hold, that a reasonable salary for Lynn was $70,000 in the fiscal year ended August 31, 1972, $88,000 in the fiscal year ended August 31, 1973, and $91,500 in the fiscal year ended August 31, 1974. *344 Frank's responsibilities were largely unstated in the record. He was not a full-time officer, had health problems, and was not taking an active part in the business. Due to the poor record on this issue and in view of the stated part-time nature of his work and the fact that he retired after the end of the year, we hold that petitioner has not met his burden of proof to show that respondent's determination of Frank's salary was erroneous. Accounting and Legal Fees
Petitioner deducted legal and accounting fees paid in connection with the redemption of its stock from Frank Snyder and the sales of its stock from Frank to Lynn Snyder. It is petitioner's position that the fees were paid for tax advice and that the cost of tax advice is fully deductible under section 212(3) even if it is paid in connection with a capital transaction, relying on Sharples v. United States, 209 Ct.Cl. 509, 533 F.2d 550 (1976). In that case the taxpayer owned a corporation which sold a leasehold interest in Venezuelan oil properties. The corporation was liquidated, and Venezuela then issued a proposed tax deficiency on the sale. The taxpayer personally paid legal expenses in *345 successfully fighting the tax assessment. The Court of Claims held that the taxpayer was entitled to a deduction under section 212(3) for these expenses. Initially, we note that the legal and accounting fees were paid in connection with the redemption of petitioner's stock from Frank and the sale of its stock from Frank to Lynn. To the extent the fees were paid by petitioner in regard to the sale by Frank to Lynn, they represented expenses paid for the benefit of another. Such expenses would not be deductible. Cf. United States v. Davis, 370 U.S. 65 (1962), rehearing denied 371 U.S. 854 (1962). Sharples is not in point. There the Court of Claims held that because the taxpayer became liable for the corporation's taxes when the corporation liquidated, the tax liability was personal to the taxpayer. This is not the case here. Because the business of a corporation is not considered the business of its shareholders, Burnet v. Clark, 287 U.S. 410 (1932), the expenses undertaken by Snyder Brothers for the benefit of its shareholders rather *346 than for its own benefit are nondeductible. Unfortunately, there is nothing in the record from which we may make a determination of the extent to which the redemption of Frank's shares by Snyder Brothers was for the benefit of the company. Petitioner relies heavily upon its characterization of the expenditures in question as relating to tax advice, and it has attempted to establish this point through the testimony of its accountant. This approach, however, is inapposite in that section 212(3), upon which petitioner relies, is only applicable "in the case of an individual * * *." Thus, if the expenses in question are deductible by petitioner, a corporate taxpayer, such deduction would fall under section 162 as an ordinary and necessary business expense, [9] and their qualification for deduction would not necessarily turn on whether the amounts were paid for tax advice. On the other hand, if petitioner were able to establish that the fees in question were paid for tax advice relating solely to petitioner's taxes, the amounts would presumably be deductible under 162. However, as discussed above, it appears that the stock transactions involved were effected primarily for the benefit *347 of certain stockholders, and that therefore, the professional services in question would have been primarily for their benefit. We are unable to find on this record what, if any, portion of the fees in question was incurred for petitioner's benefit, and accordingly, we must sustain respondent's disallowance. Use of Cadillac
Petitioner furnished Frank Snyder with the use of a cadillac which it had leased. Respondent disallowed these lease expenses. No evidence was introduced to show that it was necessary for Snyder Brothers to furnish Frank with the full-time use of an automobile. Since the burden of proof is on petitioner, we must hold for respondent on this issue. [10]
Depreciable Life of Assets
Petitioner's accountant testified *348 that the useful life of the paving was four years. On brief, respondent agreed with this testimony, and we have found as a fact that four years is the proper useful life. Except for the paving, petitioner did not introduce any evidence bearing on the useful lives of any of the assets in issue. Therefore, we must hold for respondent with respect to all of such other assets. Welch v. Helvering, 290 U.S. 111 (1933). Decisions will be entered under Rule 155.
Footnotes
1. Upon joint motion of the parties, the cases herein have been consolidated for trial, briefing, and opinion.↩
2. The terms of the debentures are set out in full in United States v. Snyder Brothers Company,367 F.2d 980, 986-987 (5th Cir. 1966), cert. den. 386 U.S. 956↩ (1967).
3. Unless otherwise stated, all section references hereinafter are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
*. Insufficient data Companies reporting: 173 Percentage paying bonus: 72.3 Average bonus as a percentage of base salary: 43.8↩
4. In the notice of deficiency, these amounts were not brlken down; rather, respondent simply disallowed an aggregate of $36,000 for the fiscal year ending 8-31-72 and $38,000 for the fiscal year ending 8-31-73 as unreasonable compensation. These totals are allocated only on brief.↩
5. Petitioner concedes that based on this argument only 5/12 of the interest paid in its fiscal year ended August 31, 1972 should be deductible (the amounts paid from April 1, 1972 through August 31, 1972); the amounts paid prior to April 1, 1972 (September 1, 1971 through March 31, 1972) would be nondeductible.↩
6. After June 23, 1972, Lynn Snyder held three of the debentures and the remaining eleven were held in trust for Sheryl.↩
7. Under this analysis, even if the doctrine of collateral estoppel did not apply, we believe that the facts in this case are indistinguishable from those in United States v. Snyder Brothers Company↩ and would dictate the same result.
8. Pension benefits in each of the years were $5,000, $15,000, and $5,832, respectively;.9 percent of Snyder Brothers' net sales total $21,245, $23,201, and $26,639, respectively. In determining reasonable compensation both deferred and nondeferred compensation must be taken together. LaMastro v. Commissioner, 72 T.C. 377 (1979). Edwin's Inc. v. United States, 501 F.2d 675, 679 (7th Cir. 1974), Bianchi v. Commissioner, 66 T.C. 324, 330 (1976), affd. per curiam 553 F.2d 93 (2d Cir. 1977). See also Paramount Clothing Co., Inc. v. Commissioner, T.C. Memo. 1979-64↩.
9. We note that the same "ordinary and necessary" and "reasonable" criteria which apply under section 162, are also applicable to deductions claimed by individuals under section 212. See section 1.212-1(d), Income Tax Regs.↩
10. Nor would the amounts be deductible as reasonable compensation; see discussion above.↩